REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

*Bid Protest*

**[FILED UNDER SEAL]**

| | |
|---|---|
| ASHBRITT, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 1:08-cv-473<br>Judge Williams |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR SUMMARY JUDGMENT**

David J. Taylor
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW
Washington, DC 20005
Ph: (202) 898-5838
Fax: (202) 682-1639
davidtaylor@spriggs.com

*Counsel of Record for Plaintiff AshBritt, Inc.*

Dated: September 8, 2008

OF COUNSEL:
William J. Spriggs
Stephen A. Klein
Katherine A. Allen
Rachel W. McGuane
Amanda L. Edwards
SPRIGGS & HOLLINGSWORTH

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iv

I. INTRODUCTION .......... 1

II. STATEMENT OF QUESTIONS INVOLVED .......... 3

III. STATEMENT OF THE CASE .......... 4

IV. ARGUMENT .......... 7

A. Legal Standards .......... 7

B. The Corps' Decision to Mark Down AshBritt's Small Business Subcontracting Plan Was Arbitrary and Capricious. .......... 8

1. The Corps Did Not Evaluate All Offerors' Subcontracting Plans Equally or Consistently. .......... 9

2. The Corps Conducted Misleading, Incomplete, and Unequal Discussions in Violation of FAR § 15.306 Regarding AshBritt's Small Business Subcontracting Plan. .......... 11

3. The Corps Failed to Adjust its Evaluation to Reflect the Requested Improvements in AshBritt's Subcontracting Plan. .......... 13

C. The Corps Conducted Unequal Discussions with AshBritt Regarding Price, Causing AshBritt's Price Proposal to be [redacted] in Relation to its Competitors Than it Otherwise Would Have Been. .......... 15

1. The Corps Advised the Offerors Unequally Regarding Their Initial Price Proposals. .......... 16

2. As a Direct Result of These Unequal Discussions, AshBritt Submitted [redacted] Prices in Relation to the IGE than its Competitors, to its Competitive Disadvantage. .......... 19

3. The Proper Remedy for the Corps' Unequal Discussions is Re-Negotiation and Revised Pricing. .......... 20

D. The Corps Acted Arbitrarily and Capriciously In Connection With the IGE, on Which it Based its Price Discussions. .......... 21

1. It is Impermissible for the Corps to Base Discussions on an IGE It Knows to be Flawed. .......... 22

2. It is Impermissible for the Corps to Revise Its IGE and Ultimately Abandon It Without Reopening Discussions. ....23

3. AshBritt Should Have Been Afforded an Opportunity to Revise its Prices When the Corps Revised and/or Abandoned its IGE. ....25

E. The Corps Conducted Inadequate Discussions Regarding the Automated Debris Management System ....25

F. AshBritt is Entitled to Summary Judgment Regarding the Corps' Failure to Enforce The Explicit Solicitation Requirement That All Prices Be Fully Burdened. ....27

G. The Corps Failed to Apply the Evaluation Criteria Identified in the Solicitation when Awarding the Reach Back Contracts. ....32

V. ASHBRITT IS ENTITLED TO INJUNCTIVE RELIEF. ....34

A. Standard ....34

B. Likelihood of Success on the Merits ....35

C. Irreparable Injury ....35

D. Public Interest ....36

E. Balance of Harms ....37

VI. CONCLUSION ....38

EXHIBIT 1 ....E-000001

EXHIBIT 2 ....E-000011

EXHIBIT 3 ....E-000020

EXHIBIT 4 ....E-000022

# TABLE OF AUTHORITIES

## Cases

*Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34 (1997)....................................21

*Astro-Space Laboratories, Inc. v. United States*, 200 Cl. Ct. 282 (1972).......................................31

*Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) ................................8

*Banknote Corp. of America v. United States*, 56 Fed. Cl. 377 (2003)............................................33

*Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005)..........................................1, 7, 8, 35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................................................8

*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (2004) .....................................................36

*DTH Management Group*, B-252879, 93-2 CPD ¶ 227, Oct. 15, 1993....................................24, 25

*Dubinsky v. United States*, 43 Fed. Cl. 243 (1999).........................................................................33

*Dynacs Eng'g Co., Inc. v. United States*, 48 Fed. Cl. 124 (2000)....................................................12

*Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388 (1999) ....................................................37

*FMC Corp. v. United States*, 3 F.3d 424 (Fed. Cir. 1993)..............................................................34

*Galen Med. Assocs. v. United States*, 369 F.3d 1324 (Fed. Cir. 2004)............................................35

*Galen Medical Associates, Inc. v. United States*, 74 Fed. Cl. 377 (2006) .......................................12

*Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003) ......................................................12, 21, 27

*GTSI Corp.,* B-286979, 2001 CPD 55 (March 22, 2001).........................................................30, 31

*Hol-Gar Mfg. Corp. v. United States*, 169 Cl. Ct. 384 (1965).......................................................31

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001) ...........................................................................................................................8

*ITT Federal Services Corp. v. United States*, 45 Fed. Cl. 174 (1999)............................................33

*Jamsar, Inc. v. United States*, 194 Cl. Ct. 819 (1971) ......................................................................31

*Klinge Corp. v. United States*, 82 Fed. Cl. 127 (2008).....................................................................36

*Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238 (2001)...............................................................7

*Lockheed Martin Corp.*, B-293679, 2004 CPD ¶ 115, May 27, 2004 ....20, 22, 25

*ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57 (2001), *aff'd*, 30 Fed. App'x. 995, 2002 WL 418168 (Fed. Cir. 2002) ....11, 31

*Metcalf Const. Co., Inc. v. United States*, 53 Fed. Cl. 617 (2002) ....12

*Modular Communications Systems, Inc.*, B-241858, 91-1 CPD ¶ 263, March 8, 1991 ....10

*OTI Am., Inc. v. United States*, 73 Fed. Cl. 758 (2006) ....35

*PGBA, L.L.C. v. United States*, 389 F.3d 1219 (Fed. Cir. 2004) ....34

*PGBA, L.L.C. v. United States,* 57 Fed. Cl. 655 (2003) ....36, 37

*Price Waterhouse*, 86-1 CPD ¶ 54, 1986 WL 60730 (Comp. Gen. 1986) ....12

*Ranor, Inc.*, B-255904, 94-1 CPD ¶ 258, Apr. 11, 1994 ....21, 24, 25

*Raytheon Co. v. United States*, 2 Cl. Ct. 763 (1983) ....31

*United Pacific Insurance Co. v. United States*, 204 Cl. Ct. 686, 692 (1974) ....31

*Univ. Research Co., LLC v. United States*, 65 Fed. Cl. 500 (2005) ....37

**Statutes**

10 U.S.C. § 2305(b)(1) ....10, 33

28 U.S.C. § 1491(b)(4) ....8, 35

31 U.S.C. § 3553 ....7

5 U.S.C. § 706 ....35

5 U.S.C. § 706(2)(A) ....8

5 U.S.C. §§ 701-706 (1994) ....8

FAR § 1.102-2(c)(3) ....10

FAR § 14.301(a) ....30, 32

FAR § 14.404-2(a) ....30

FAR § 15.304(d) ....33

FAR § 15.305(a) ....10, 33

FAR § 15.306(d)(2) ....................................................................................................................27

FAR § 15.306(d)(3) ....................................................................................................................11

FAR § 15.306(e)(1)................................................................................................................ passim

**Rules**

RCFC 56 ..................................................................................................................................1, 8

REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

*Bid Protest*

**[FILED UNDER SEAL]**

| | | |
|---|---|---|
| ASHBRITT, INC., Plaintiff, | ) | |
| v. | ) | No. 1:08-cv-473 Judge Williams |
| THE UNITED STATES, Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD FOR DECLARATORY AND INJUNCTIVE RELIEF, AND FOR SUMMARY JUDGMENT**

AshBritt, Inc. ("AshBritt") submits this memorandum in support of its Motion for Judgment on the Administrative Record for Declaratory and Injunctive Relief, and for Summary Judgment. AshBritt seeks judgment on the Administrative Record under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC") on all of the grounds set forth below, except for the "burdening" argument set forth in Section IV.F., for which AshBritt seeks summary judgment under RCFC 56.[1]

## I. INTRODUCTION

This bid protest involves a series of contracts awarded by the United States Army Corps of Engineers (the "Corps") under its Advance Contract Initiative ("ACI") program, which puts debris removal contractors in place for particular geographic regions of the country in advance of

[1] This protest ground is supported by a single affidavit in addition to the Administrative Record and thus is treated as a motion for summary judgment. *See* RCFC 56; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005) .

a hurricane or other natural or man-made disaster. Under the ACI program, when a disaster event occurs the contractor already is in position and ready to mobilize immediately.

Under Solicitation No. W912P8-07-R-0101 (the "Solicitation"), the Corps awarded a primary and a "reach back" or back-up contract for each of ten geographic regions. Yet despite AshBritt's extensive experience and past success in working with the Corps to respond to major disasters – AshBritt was the Corps' prime debris removal contractor in Mississippi following Hurricane Katrina – the Corps awarded AshBritt only a single primary contract in one region and a single reach back contract in a second region. Other offerors with whom AshBritt compares favorably received multiple primary and/or reach back contracts. While AshBritt was pleased to receive the two contracts, the Corps committed a number of serious errors in its evaluation process and in its discussions with the offerors that prevented AshBritt from receiving additional ACI contracts. The Corps arbitrarily and capriciously:

- Marked down AshBritt's technical rating on its small business subcontracting plan (AshBritt was rated [redacted] on all other technical factors), but not another offeror's plan that contained the same alleged deficiency;

- Violated FAR § 15.306's discussion requirements by engaging in misleading, incomplete, and unequal discussions regarding AshBritt's subcontracting plan;

- Engaged in unfair, unequal, and misleading discussions with AshBritt with regard to its price proposal by advising AshBritt that certain of its initial prices were too [redacted] while failing to so advise other offerors whose initial prices were [redacted]; and likewise, by advising other offerors that certain of their initial prices were too [redacted] while failing to so advise AshBritt, whose initial prices were [redacted];

- Based its price discussions with AshBritt on an Internal Government Estimate ("IGE") that it knew to be flawed, and subsequently revised and ultimately abandoned altogether the IGE without notifying AshBritt or providing further discussions and an opportunity to submit a revised pricing proposal;

- Failed to hold additional discussions that the Corps acknowledged internally were necessary; and, perhaps most egregiously,

- Failed to enforce the express requirement in the Solicitation that all price proposals be fully burdened with indirect costs and profit, and in at least one instance *actually advised* an offeror to violate the Solicitation by not burdening its proposed price; and

- Likewise violated the express terms of the Solicitation by failing to apply the price evaluation factor in its selection of reach back contractors.

In short, the Corps conducted a fatally flawed evaluation inconsistent with the terms of the Solicitation and based on unequal and misleading discussions. Because the Corps' errors affected not just its evaluation process, but the offerors' actual price proposals themselves, the only effective remedy is to require the Corps to accept new price proposals untainted by the Corps' arbitrary conduct in the geographic regions not awarded to AshBritt.

## II. STATEMENT OF QUESTIONS INVOLVED

1. Whether the Corps improperly downgraded AshBritt's small business subcontracting plan based upon unequal discussions, and for an alleged deficiency also present in another offeror's proposal that was not similarly downgraded;

2. Whether the Corps conducted unequal discussions that resulted in AshBritt's price proposals [redacted] those of certain offerors;

3. Whether the Corps acted arbitrarily and capriciously by basing price discussions on an IGE that the Corps knew was flawed and subsequently revised and then abandoned altogether without notifying AshBritt;

4. Whether the Corps acted arbitrarily and capriciously by failing to hold additional discussions that it acknowledged internally were necessary;

5. Whether the Corps acted arbitrarily and capriciously by not enforcing an express solicitation requirement that all prices be fully burdened with indirect costs and profit; and

6. Whether the Corps acted arbitrarily and capriciously by departing from the solicitation's evaluation methodology with regard to the "reach back" contracts awarded

## III. STATEMENT OF THE CASE

The Corps issued the Solicitation on June 23, 2007 to award multiple Advance Contracting Initiative Single Award Task Order Contracts for Debris Management Services within the United States and its Territories. AR Tab 5 at 209.[2] Prior to the Solicitation, predecessor ACI contracts were in place; AshBritt was the incumbent ACI contractor for Louisiana and Mississippi. The predecessor ACI contracts expired on April 30, 2008.

The ACI contracts facilitate relief and clean up efforts following a major natural or man-made disaster by ensuring that contractors are in place for immediate mobilization. The ACI contracts are organized by geographic region. AR Tab 5 at 218, 233. In each of the ten regions identified in the Solicitation, a primary and a "reach-back" contract was to be awarded, with the reach-back contract to be activated when the scope of a disaster creates a need that exceeds the capabilities of any single contractor. *Id.* at 317. The Solicitation permits offerors to bid in any or all regions on the primary contract, the reach-back contract, or both, although there are certain adjacency restrictions.[3] The ACI contracts are Indefinite Delivery/Indefinite Quantity ("ID/IQ") contracts for a single base year and four one-year option periods, with a maximum capacity of $250 million over the life of the contract. *Id.* at 25; AR Tab 6, Am. 0001 at 4.

The Solicitation establishes five evaluation factors for assessing proposals: Past Performance, Management/Operations Plan, Small Business Subcontracting Plan, Technical

---

[2] Citations to the Administrative Record ("AR) herein include references to the Bates # assigned to each page of the AR as produced by the Government.

[3] A contractor may not win contracts in adjacent regions, nor a reach back and primary contract in adjacent regions. AR Tab 5 at 25, 109.

Approach to Sample Task Order, and Price. AR Tab 5 at 318-319. It further provides that the non-price factors are comparatively equal in weight and, when combined, are "significantly" more important than cost or price. *Id.* AshBritt was rated [redacted], on all of the non-price factors (price was not rated) except for Small Business Subcontracting Plan, which was rated [redacted]. AR Tab 22 at 522.

[redacted] offerors submitted timely proposals in response to the Solicitation. [redacted] of these offerors, including AshBritt, were placed in the competitive range. AR Tab 2 at 44. The Corps held discussions with each such offeror on or around August 31, 2007, and on September 10, 2007, Final Proposal Revisions ("FPR") were submitted. AR Tab 17.

On January 27, 2008, AshBritt was notified – two weeks prior to contract award – that despite its highly rated proposal, extensive debris removal experience, and successful history of prior Corps contracts, it had not been selected for award of any primary or reach back contract in any of the 10 regions. AR Tab 22 at 522-523. By taking the unusual step of informing AshBritt of its non-selection just prior to award, the Corps effectively compelled AshBritt to request a debriefing pre-award rather than post-award, thereby precluding AshBritt from receiving any information related to the winning bids. The Corps' reasons for notifying AshBritt in this unusual manner remain unknown.

On February 4, 2008, without the benefit of a post-award debriefing, AshBritt protested the Corps' selection decision at the Government Accountability Office ("GAO"). AR Tab 23 (Protest B-310442.2). AshBritt raised a number of defects in the Corps' discussion and evaluation processes that rendered the selection decisions unreasonable, arbitrary, and capricious. *Id.* Less than three weeks later, on February 22, 2008, counsel for the Corps notified the GAO that the Corps had "identified deficiencies in its evaluation of proposals" and would be

taking corrective action, and the Corps accordingly requested that the GAO dismiss AshBritt's protest as academic. AR Tab 24. On March 5, 2008, the GAO did so. AR Tab 25.

Following the re-evaluation, the Corps notified AshBritt on April 11, 2008 that it had been selected for award of Contract Number W912P8-07-D-0053, as primary contractor for Region 2b (Georgia, North Carolina and South Carolina) and as reach-back contractor for Region 3 (Mississippi and Louisiana). AR Tab 33. Because AshBritt was concerned that the Corps might not have corrected all of the evaluation defects identified in its protest, AshBritt requested a post-award debriefing, which was held on April 30, 2008. AshBritt's concern stemmed from the fact that other offerors had been awarded significantly more than two of the twenty potential prime and reach back ACI contracts.[4]

At the debriefing, AshBritt learned that its concerns had been well founded. The only "corrective action" taken by the Corps was to re-consider the offerors' price proposals with the four option years included, which the Corps had failed to do in its initial evaluation. In essence, the sum and substance of the Corps "corrective action" was to perform an additional mathematical calculation on the existing price proposals to include the option year pricing, which of course it should have done to begin with. The Corps took no steps whatsoever to remedy or even address the multitude of flaws identified by AshBritt's protest. AR Tab 2 at 48-49. Consequently, AshBritt filed a second protest at GAO on May 9, 2008 (GAO Protest No. B-310442.3), again seeking correction of the flaws in the Corps' evaluation process. AR Tab 1.[5]

---

[4] For example, other offerors received as many as four primary or six reach back contracts. AR Tab 33 at 626.

[5] On April 30, 2008, just before filing its second protest, the previous ACI contracts, including AshBritt's, expired. Acutely aware of the approach of the hurricane season and the nation's need to have ACI contracts in place, AshBritt deliberately waived its statutory right to an automatic stay of the newly-awarded ACI contracts under the Competition in Contracting Act ("CICA"),

On June 20, 2008, AshBritt dismissed its second protest at the GAO and elected instead to proceed in this forum.[6]

## IV. ARGUMENT

### A. Legal Standards

The legal standard applicable to a motion for judgment upon the administrative record under RCFC 52.1 differs from that applied to motions for summary judgment. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005); *Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 246-47 (2001). "[P]roceeding under RCFC [52.1] restricts the evidence to the agency record. . ." *Bannum*, 404 F.3d at 1356. Unlike with a motion for summary judgment, a genuine dispute regarding a material fact will not preclude a judgment on the administrative record. *Id*. Where there is a dispute of material fact, the Court must make findings of fact from the record as if it were conducting a trial. *Id.* at 1357.

With regard to AshBritt's protest ground based on the Solicitation requirement that proposed prices be fully burdened (*see* Section IV.F., below), the summary judgment standard applies: Judgment shall be entered in AshBritt's favor if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

31 U.S.C. § 3553. AshBritt chose to file its second protest after the five day window that would have triggered the CICA stay.

[6] AshBritt chose to bring its protest in this Court because the GAO had declined to order the Corps to produce a number of critical documents omitted from the Agency Report, most notably the pricing information and small business subcontracting plans of the other offerors in the competitive range. This Court has since agreed such documents are relevant to AshBritt's protest and ordered them produced.

matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Bannum,* 404 F.3d at 1355-56.

This Court reviews challenges to agency actions in a bid protest according to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (1994). *See* 28 U.S.C. § 1491(b)(4) (incorporating the APA standards for bid protests). The APA states in relevant part that "[t]he reviewing court shall . . . (2) hold unlawful and set aside agency action, findings and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA standards, an Agency's procurement action should be "set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). *See also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004).

**B. The Corps' Decision to Mark Down AshBritt's Small Business Subcontracting Plan Was Arbitrary and Capricious.**

As noted, the Corps rated AshBritt's proposal [redacted] on every technical evaluation factor except for the small business subcontracting plan, which the Corps rated [redacted] The Corps' decision to mark down AshBritt's small business subcontracting plan was arbitrary, capricious, and not in accordance with the law and regulation. The Corps evaluated the proposals unequally, as it failed to mark down another offeror's plan that contained the same alleged deficiency as AshBritt's; engaged in misleading, incomplete, and unequal discussions with AshBritt in violation of FAR § 15.306; and failed to credit AshBritt when it made the very changes recommended by the Corps.

REDACTED VERSION

Though AshBritt's overall grade was [redacted], this improper reduction in the rating of one evaluation factor, though small, nonetheless was sufficient to place AshBritt's technical ranking slightly [redacted] several other offerors. Had AshBritt's subcontracting plan not been marked down, it would have been technically [redacted] to two other winning offerors, [redacted], and technically [redacted] to two other offerors, winning offeror [redacted] Because of the fluid nature of the process used to select a primary contractor for each region due to the Solicitation's adjacency limitations, any change in rankings would have had a "domino affect" on the Corps' analysis and awards in multiple regions.

**1. The Corps Did Not Evaluate All Offerors' Subcontracting Plans Equally or Consistently.**

According to the Corps, AshBritt received a rating of [redacted] instead of [redacted] on its small business subcontracting plan primarily because, although AshBritt provided a long list of potential subcontractors from its database of small businesses, [redacted] AR Tab 2 at 58. However, AshBritt's small business subcontracting plan was not appreciably different in this regard than [redacted] plan, which nonetheless was rated [redacted] AR Tab 57 at 1218.

AshBritt's plan featured a lengthy list of potential subcontracting partners that identified the name of each contractor's key contact person, address, phone number, and reported equipment quantities. AR Tab 66 at 1442-1469.[7] [redacted] likewise simply provided a list

[7] AshBritt had revised its plan in this manner to address the Corps' stated concerns. The Corps had initially rated AshBritt's subcontracting plan as [redacted] but noted during discussions that [redacted] AR Tab 57 at 1195. The Corps' Agenda for its discussions with AshBritt stated, [redacted] AR Tab 17 at 460. The Corps expressed no other

REDACTED VERSION

of potential subcontractors, indicating the contractor's name, contact person, and address. Nowhere on its chart does [redacted] indicate what type of debris removal work the individual subcontractors were equipped to perform. AR Tab 67 at 1485-1529. Yet [redacted] plan was not marked down on that basis, whereas AshBritt's plan was.

Any differences between the lists of potential subcontractors proposed by [redacted] and AshBritt are negligible. Both lists include the names and contact information for small businesses eligible to participate in the debris mission. Indeed, AshBritt's list actually provides the Corps with *more* information by identifying each company's reported equipment quantities, which indirectly indicates what types of services they were prepared to provide. Yet, despite having the same alleged deficiency as AshBritt – *i.e.*, failing to specify what type of work each proposed subcontractor would perform – the Corps gave [redacted] full credit for its [redacted] and considered this to be a positive attribute of [redacted] plan. AR Tab 56 at 1185.[8] For the Corps to assess AshBritt's voluminous and thorough database as a weakness, while simultaneously assessing an essentially identical database submitted by [redacted] as a strength, plainly is arbitrary and indicates the unequal nature of the Corps' evaluation of this factor. The Corps admits that AshBritt's database listing was a "primary" reason AshBritt was not rated [redacted] in this area. AR Tab 2 at 58.

In evaluating competitive proposals solely on the factors specified in the Solicitation, as it must (*see* FAR § 15.305(a); 10 U.S.C. § 2305(b)(1)), the Corps is obligated to treat all offerors fairly and equally. FAR § 1.102-2(c)(3); *Modular Communications Systems, Inc.*, B-241858, 91-

---

concerns with AshBritt's subcontracting plan; yet despite having remedied the problem identified by the Corps, AshBritt's rating for this factor was unchanged. AR Tab 59 at 1217.

[8] See also the Corps' revised proposal consensus papers for [redacted] subcontracting plan, which also identified the extensive list of subcontractors as a strength. AR Tab 59 at 1218.

1 CPD ¶ 263 at 4, March 8, 1991 (sustaining protest where specifications were relaxed for one offeror but not another). The Corps violated this fundamental tenet of procurement law by marking down AshBritt's subcontracting plan based on an alleged deficiency that it ignored another offeror's plan.

**2. The Corps Conducted Misleading, Incomplete, and Unequal Discussions in Violation of FAR § 15.306 Regarding AshBritt's Small Business Subcontracting Plan.**

Both the original and revised Source Selection Decision Documents state that AshBritt [redacted] AR Tab 21 at 510-2; Tab 33 at 616-7. However, the Corps engaged in misleading and incomplete discussions with AshBritt by failing to raise this supposed deficiency during the August 31, 2007 discussions or at any other time. Indeed, [redacted] goals are not mentioned at all in either the Corps' discussion agenda or in its written summary of the discussions with AshBritt. AR Tab 17 at 459; Tab 18 at 480. Instead, the Corps focused solely on the fact that AshBritt's plan needed to provide more information regarding potential subcontractors, which AshBritt readily rectified. *Id.*

A procuring agency is required to discuss with an offeror "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR § 15.306(d)(3). This obligation is not met if an offeror is not advised of the defects in its proposal that fail to satisfy the requirements of the procurement. *ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 71 (2001), *aff'd*, 30 Fed. App'x. 995, 2002 WL 418168 (Fed. Cir. 2002). Accordingly, the Corps' failure to convey

any concerns regarding how AshBritt's subcontracting plan addressed [redacted] – for which reason the Corps subsequently downgraded AshBritt's score on the AFARS checklist[9] – violates the FAR's requirement to discuss any such "deficiencies."

Not only did the Corps mislead AshBritt through its incomplete discussions, it also treated AshBritt unequally as compared to other offerors. Agencies are prohibited from engaging in discussions that "[f]avor[] one offeror over another." FAR § 15.306(e)(1).[10] Unequal discussions occur where an agency provides advice to one offeror, but fails to provide that advice to other offerors to whom the advice also should be given. *See, e.g.*, *Metcalf Const. Co., Inc. v. United States*, 53 Fed. Cl. 617, 634 -635 (2002) ("[T]he bidders were treated unequally where one bidder was advised, in no uncertain terms, not to exceed the budget ceilings, and a second bidder under identical circumstances was not.").[11]

Here, the Corps engaged in unequal discussions in violation of FAR § 15.306(e)(1) by advising other offerors concerning their failure to adequately address the [redacted],

---

[9] AR Tab 58 at 1198. The AFARS – Appendix DD Subcontracting Plan Evaluation Scoring System creates a methodology for the uniform and consistent evaluation of subcontracting plans within the Army. The guide is used to review all subcontracting plans, including those submitted in response to this Solicitation.

[10] *See also Galen Medical Associates, Inc. v. United States*, 74 Fed. Cl. 377 (2006) ("Discussions must be held equally with competitive bidders."); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 -653 (2003) ("[T]he fundamental principle of government procurement [is] that contracting officers [must] treat all offerors equally."); *Dynacs Eng'g Co., Inc. v. United States*, 48 Fed. Cl. 124, 136 (2000) ("[T]he procuring agency must avoid conducting prejudicially unequal discussions.").

[11] *See also Dynacs Eng'g*, 48 Fed. Cl. at 136 (finding the government's discussions with one bidder but not another regarding the weaknesses of its proposal violated 48 C.F.R. § 15.306(e)(1)); *Price Waterhouse*, 86-1 CPD ¶ 54, 1986 WL 60730 (Comp. Gen. 1986) (where the proposed efforts of both offerors within the competitive range were "high" in comparison to the government estimate, it constitutes unfair and unequal treatment to address this issue with only one offeror).

REDACTED VERSION

but failing to so advise AshBritt and then marking AshBritt down on that basis. AshBritt was not the only contractor whose initial small business subcontracting plan did not include sufficient information regarding the [redacted]. In fact, the initial evaluation notes for [redacted] demonstrate that both companies failed to discuss the utilization of [redacted] AR Tab 56 at 1174, Tab 57 at 1190 (ECC); AR Tab 56 at 1168, Tab 57 at 1194 ([redacted]). However, unlike AshBritt, the Corps brought this deficiency to the attention of [redacted] during the August 31, 2007 discussions. *See* AR Tab 17 at 469 (Discussion Agenda for [redacted]); AR Tab 18 at 481 [redacted]); AR Tab 17 at 463 [redacted]

Failing to raise this deficiency with AshBritt while simultaneously informing others of the same problem in their plans is not only contrary to federal statute, but is further evidence of the Corps' arbitrary evaluation with regard to the Small Business Subcontracting Plan factor. As noted, AshBritt's downgrade to [redacted] competitively prejudiced AshBritt in this procurement, and AshBritt could have eliminated this deficiency had it been properly informed.

### 3. The Corps Failed to Adjust its Evaluation to Reflect the Requested Improvements in AshBritt's Subcontracting Plan.

In response to discussions with the Corps, AshBritt effectively remedied the deficiencies identified by the Corps, yet its small business subcontracting plan received the same rating after the revisions as before. The Corps acted arbitrarily by ignoring AshBritt's revisions that addressed the Corps' stated concerns.

As discussed above, the Corps' only complaint during discussions regarding AshBritt's subcontracting plan was the vaguely worded statement that, [redacted]

REDACTED VERSION

[redacted] and AshBritt fully addressed this concern by revising its plan to include an extensive list detailing the subcontractors' key contact person, name, address, phone number, and reported equipment quantities. Yet the Corps gave AshBritt no credit for this revision, and AshBritt's rating did not change at all. Instead, the Corps moved the goalposts once more by marking down AshBritt's plan based on a *new* problem – the fact that AshBritt's list of subcontractors, which now *did* identify the subcontractors in sufficient detail, nonetheless did not specify the type of work that each subcontractor might perform. *See generally* Section IV.B.1, *supra*.

The Corps also failed to credit revisions to AshBritt's subcontracting plan that addressed another alleged deficiency identified by the Corps prior to discussions. The SSEB Initial Evaluation Working Papers for Subcontracting Plans noted that AshBritt's plan did not include [redacted] AR Tab 56 at 1184. Accordingly, AshBritt received [redacted] points for this portion of the AFARS – Appendix DD Subcontracting Plan Evaluation Scoring System. *Id.* at 1188. AshBritt was aware of this deficiency and discussed it with the Corps during the August 31, 2007 discussions. AshBritt thus took particular care to include this information in its revised Small Business Subcontracting Plan, adding two new sections to its proposal, including [redacted] AR Tab 66 at 1449-51. Despite these significant additions, the Corps did not alter AshBritt's score at all for this category on the AFARS – Appendix DD, further evidencing the Corps' arbitrary and capricious evaluation of AshBritt's proposal. AR

Tab 58 at 1198. In fact, the Corps neglected to alter its AFARS rating in any fashion. *Compare* AR Tab 56 at 1188 *with* AR Tab 58 at 1198.[12]

### C. The Corps Conducted Unequal Discussions with AshBritt Regarding Price, Causing AshBritt's Price Proposal to be Higher in Relation to its Competitors Than it Otherwise Would Have Been.

The Corps also violated FAR § 15.306(e)(1)'s prescription to engage in equal discussions that do not favor one offeror over another with regard to the offerors' price proposals. AshBritt learned in its debriefings that [redacted] was the primary reason it did not receive more contracts. But to the extent AshBritt's price proposal was [redacted], this was the direct result of the Corps' unequal discussions. The Corps advised AshBritt that a number of its initial price proposals for various contract line items ("CLINs") were [redacted], suggesting that [redacted]. However, in many instances the other offerors' initial price proposals for the same CLINs were [redacted], yet they were *not* advised that [redacted]. Likewise, there are several instances where another offeror was advised that its price proposal for a particular CLIN [redacted], but AshBritt was not similarly advised even though its price proposal for that CLIN [redacted]

In short, whether or not by design, the Corps' unequal discussions regarding the offerors' price proposals systematically favored other offerors over AshBritt, resulting in AshBritt's FPR [redacted]. The FPRs, on which the Corps based its final evaluations and award decisions, thus are irretrievably tainted by the Corps' unequal discussions

[12] This is particularly egregious given the fact that the AFARS checklist itself recognizes that this is an area where a contractor could be erroneously downgraded, stating that, "to avoid penalizing the contractor when there has been no previous defense contract, assign 10 points." The Corps did not exercise the level of care needed to ensure proper application of the checklist.

in violation of FAR § 15.306(e)(1), and the Corps' evaluation based thereon is fatally flawed. The only effective remedy is to permit AshBritt to submit new FPRs in the regions it did not win.

**1. The Corps Advised the Offerors Unequally Regarding Their Initial Price Proposals.**

The Solicitation provides that the price evaluation factor is to be evaluated based upon the fixed price CLINs set forth in the rate schedule at Section B of the Solicitation. AR Tab 5 at 319. During its August 2007 discussions with the offerors, the Corps advised the offerors how their initial price proposals compared with the IGE so that the offerors could revise their proposals accordingly. However, the Corps did not conduct these price discussions equally, but rather favored other offerors over AshBritt.

The Corps advised AshBritt that a number of its proposed prices were [redacted], including, among others, for [redacted]. *See* AR Tab 17 at 460; AR Tab 30 at 578. However, a number of the other offerors proposed prices for these CLINs that were approximately [redacted] than AshBritt's, yet the Corps did not so advise them. *See* AR Tab 17 at 463, 466, 469, 472, and 475; AR Tab 30 at 578. Although AshBritt's competitors also proposed prices significantly [redacted] – and in most cases that were even [redacted] – AshBritt alone was told its prices were [redacted].[13]

For example, for CLIN 0023, AshBritt had the [redacted] price (though still [redacted] the IGE) of all the offerors in the competitive range,[14] yet AshBritt was the only offeror who was advised

---

[13] The Corps' Post-Negotiation Memorandum lists the specific CLINs about which each offeror was advised and indicates that AshBritt, but no other offeror, was advised with respect to these particular CLINs. AR Tab 30 at 578; AR Tab 17 at 460, 463, 466, 469, 472, and 475.

[14] *Compare* AR Tab 4B at 116-17, 121-22, 126-27, 131-32, 141-42, 146-47, 151-52, 156-57, 161-62 *with* AR Tab 50 at 823-24, 833-34, 843-44, 853-54, 863-64, 873-74, AR Tab 51 at 883-84, 895-96, 907-08, 919-20, 931-32, 943-44, 955-56, 967-68; AR Tab 52A at 992-93; AR Tab

to [redacted] its price. *See* AR Tab 30 at 578. In other words, AshBritt, to its detriment, was singled out from all the other offerors for disparate treatment. Despite that AshBritt's price already was [redacted] its competitors', *i.e.*, [redacted] the government estimate than any of the other offerors, AshBritt nonetheless was the only offeror advised to [redacted] in order to be even closer to the government estimate.[15] All other offerors were effectively advised, via silence, that their prices were [redacted] to the IGE and that there was [redacted] for them to revise their prices. A similar pattern is found with regard to [redacted]: for each of these CLINs, other offerors submitted prices that were [redacted] than AshBritt's, yet only AshBritt was advised to [redacted]. For each of these CLINs, AshBritt's competitors, like AshBritt, offered prices that were [redacted],[16] but, unlike AshBritt, they were not advised to [redacted].

With respect to two CLINs, [redacted], the converse is true: AshBritt's proposed price was [redacted] but AshBritt was not so advised, whereas two other offerors, [redacted], whose prices were not [redacted] as AshBritt's, were told that they

53 at 1002, 1011, 1020, 1029; and AR Tab 54 at 1041, 1053, 1065, 1077, 1089, 1102, 1114, 1126, 1138 (excepting a comparison of AshBritt and Xperts in Region 2c).

[15] The Corps' discussion agendas provide with respect to CLIN 0023 that only AshBritt's prices [redacted] AR Tab 17 at 460. The Corps' Post-Negotiation Memorandum, likewise, provides that in regard to [redacted], it was discussed during negotiations that only [redacted] AR Tab 30 at 578.

[16] *Compare* AR Tab 4B at 114-163 *with* AR Tab 50 at 817-24, 831-34, 841-44, 851-54, 861-64, 871-74; AR Tab 51 at 881-84, 893-96, 905-08, 917-20, 929-32, 941-44, 953-56, 965-68; AR Tab 52A at 990-93; AR Tab 53 at 1000-02, 1009-11, 1018-20, 1027-29; AR Tab 54 at 1038-1042, 1050-54, 1062-66, 1074-78, 1086-90, 1099-1103, 1111-15, 1123-27, 1135-39; AR Tab 55 at 1158-61.

should consider [redacted]. *See* AR Tab17 at 466, 472; AR Tab 30 at 578.[17] Even though AshBritt's prices were [redacted]; AshBritt did not receive similar advice.

The graphs at Exhibit 1 demonstrate this pattern of unequal and unfair price discussions. Each of the first six graphs depicts how AshBritt was advised that its prices (across multiple regions) for a particular CLIN [redacted], whereas other offerors whose prices were [redacted] [redacted] were not so advised. The last two graphs depict the converse situation, where AshBritt's prices were [redacted], but only [redacted], *whose prices were not as* [redacted], were advised of that fact. These graphs starkly reveal the nature of the Corps' unequal discussions and the manner in which AshBritt was adversely affected thereby.

No rational basis exists for the discrepancies in the Corps' discussions. Put simply, the Corps acted arbitrarily and capriciously in conducting discussions with AshBritt. The Corps' uneven advice favored the other offerors over AshBritt, encouraging adjustments that would result in their prices being [redacted] than AshBritt's for each of these CLINs. While AshBritt's competitors were encouraged to submit final prices that were [redacted] in relation to the IGE, AshBritt was encouraged to [redacted] its prices or not to [redacted] so as to be [redacted] than the IGE. The Corps' conduct plainly violated FAR § 15.306(e)(1)'s prohibition against discussions favoring one offeror over another.

---

[17] The Corps' discussion agendas provide with respect to [redacted] AR Tab 17 at 466, 472. The Corps' Post-Negotiation Memorandum, likewise, provides that in regard to [redacted] AR Tab 30 at 578.

### 2. As a Direct Result of These Unequal Discussions, AshBritt Submitted [redacted] than its Competitors, to its Competitive Disadvantage.

AshBritt reasonably assumed that the Corps would act in good faith and hold fair and equal discussions with all of the offerors. Thus, in reliance on the Corps' advice, AshBritt [redacted]. *See* AR Tab 4C at 164-208. The prices of AshBritt's competitors for these CLINs, in contrast, [redacted] *See* AR Tabs 50-55. The Corps' unequal discussions therefore directly caused a gap to develop between AshBritt's prices and those of certain of the other offerors; or where such a gap already existed, caused it to widen. For example, in Regions 2a, 3, 4, 5, 6a, and 6b, AshBritt's initial prices for [redacted]; but following the Corps' unequal discussions, [redacted].[18] In many other instances, where both AshBritt and its competitors had initial prices that were significantly [redacted] but only AshBritt was so advised, the result was that AshBritt moved from having a [redacted] vis-à-vis the other offerors to a [redacted].[19]

The adverse impact to AshBritt from the Corps' unequal discussions is depicted on the graphs at Exhibit 2, which compare AshBritt's proposed prices before and after the unequal

---

[18] *Compare* AR Tab 4B at 121-22, 141-42, 146-47, 151-52, 156-57, 161-62; AR Tab 4C at 172-73, 187-88, 192-93, 197-98, 202-03, 207-08; AR Tab 51 at 927-28, 931-32, 963-64, 967-68; AR Tab 53 at 1007, 1011; AR Tab 54 at 1108, 1114.

[19] Examples of this situation include [redacted], Region 2c; [redacted], Region 2a; [redacted], Regions 3, 5, and 6a; and [redacted], Region 2c. *Compare* AR Tabs 4B at 121 and 4C at 172 *with* AR Tab 54 at 1108 and 1114; AR Tabs 4B at 131-32 and 4C at 182-83 *with* AR Tab 55 at 1155-56 and 1160-61; and AR Tabs 4B at 141, 151, 156 and 4C at 187, 197, 202 *with* AR Tab 53 at 1006, 1010, 1015, 1020, 1024, 1028.

REDACTED VERSION

discussions to the prices of the eventual awardees in particular regions, which were aided by the Corps' unequal advice. Again, as with Exhibit 1, the charts pertaining to [redacted] depict the converse situation, where the awardee received unequal discussions to its benefit (where the awardee was advised its price was [redacted]), rather than AshBritt receiving unequal discussions to its detriment (where AshBritt was advised its price was [redacted]). As the graphs in Exhibit 2 clearly show, the result of the Corps' unequal discussions was to create or exacerbate a gap between AshBritt's prices and the prices of the eventual awardees, in every case with AshBritt's price now being [redacted].

The impact of these discussions is significant not only on the level of the individual CLIN; the Corps' discussions were unequal in regard to many different CLINs, and, as such, these inequalities also had the cumulative impact of competitively disadvantaging AshBritt. Overall, the effect of these discussions was to induce AshBritt to provide prices that were [redacted] and to induce AshBritt's competitors to [redacted]. Whether AshBritt [redacted], or from a [redacted], the net result of these unequal discussions was that AshBritt had [redacted] and was, thereby, competitively disadvantaged.

### 3. The Proper Remedy for the Corps' Unequal Discussions is Re-Negotiation and Revised Pricing.

Exactly how each offeror would have responded had the advice been meted out equally cannot now be accurately reconstructed. Where there has been a material discussion flaw, it is improper for the Court to speculate regarding the changes that might have been made in the absence of that flaw; rather, the proper remedy is to reopen negotiations, conduct fair and meaningful discussions, request new prices, and conduct new evaluations based thereon. *Lockheed Martin Corp.*, B-293679, 2004 CPD ¶ 115, May 27, 2004 ("We will not speculate

regarding the changes that Lockheed may have made to its FPR if the agency had conducted meaningful discussions"); *Ranor, Inc.*, B-255904, 94-1 CPD ¶ 258, Apr. 11, 1994 (advising that discussions be reopened, revised offers be requested, and award be made anew, where agency committed material discussion flaw). New evaluations based on revised pricing is the only remedy that can effectively undo the Corps' unequal discussions here in favor of AshBritt's competitors.

### D. The Corps Acted Arbitrarily and Capriciously In Connection With the IGE, on Which it Based its Price Discussions.

In addition to holding unequal and one-sided discussions, the Corps acted arbitrarily and capriciously by basing those discussions on an IGE that the Corps (i) knew was flawed and inaccurate at the time; (ii) subsequently revised without notification to or further discussions with the offerors; and (iii) ultimately appears to have abandoned altogether. FAR §§ 15.306(d) and 15.306(e) require any discussions with offerors whose proposals are within the competitive range to be "meaningful" and "not misleading." *See Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 48 (1997) (Agency must not even *inadvertently* mislead an offeror concerning its proposal weaknesses or deficiencies or the nature of the government's requirements); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 -653 (2003) ("While an agency has considerable discretion in conducting discussions with offerors, that discretion is not a license to mislead."). Basing its discussions on a stale IGE and refusing to hold new discussions as the IGE was revised renders the Corps' discussions misleading and not meaningful.

### 1. It is Impermissible for the Corps to Base Discussions on an IGE It Knows to be Flawed.

Even as the Corps was advising AshBritt during discussions that its initial prices were [redacted] in relation to the IGE, the Administrative Record shows that the Corps knew the IGE on which it based those discussions was inaccurate and flawed – the Corps was specifically so advised. More than a week before discussions, on August 20, 2007, the Defense Contract Audit Agency ("DCAA") submitted a memorandum to the Contracting Officer concluding that the "government should perform additional price analysis to increase the accuracy of the IGE." AR Tab 11 at 400. The DCAA also specifically identified CLINS [redacted] as being flawed. *Id.* [redacted]). Furthermore, according the Initial Evaluation Report of the Source Selection Evaluation Board, also dated August 20, 2007, the overall IGE was approximately [redacted] than the average responsible offeror's initial price proposals in each region. AR Tab 9 at 385.

Nonetheless, despite these clear indications that the IGE was an unreliable price gauge, the Corps proceeded anyway to conduct discussions based upon the flawed IGE. In particular, the Corps advised AshBritt that its prices were [redacted] in relation to the IGE for CLINs [redacted]. AR Tab 17 at 460; AR Tab 30 at 578. The Corps' decision to hold discussions based on a knowingly flawed IGE constitutes a material discussion flaw. Such discussions are misleading and unfair.[20]

[20] *See, e.g., Lockheed Martin Corp.*, B-293679, 2004 CPD ¶ 115, May 27, 2004 ("The agency's specific advice to protestor during discussions (that protestor should modify its price in relation to the then IGE) when the agency knew at that time that this amount was significantly [flawed] reflects a material discussion flaw. That is, Protester 'was materially misled with regard to the cost factors the agency intended to ultimately apply.'").

### 2. It is Impermissible for the Corps to Revise Its IGE and Ultimately Abandon It Without Reopening Discussions.

After basing its discussions with AshBritt in August 2007 on a knowingly flawed IGE, the Corps revised its government estimate but failed to inform AshBritt. *See, e.g.*, AR Tab 45 at 783-87. Revisions were made concerning some of the very CLINs that the Corps, based on the initial flawed IGE, had advised AshBritt were too low. Indeed, the Corps revised its estimated price for [redacted]. *See* AR Tab 10 at 394-95 (IGE dated July 23, 2007); AR Tab 45 at 785-86 (revised IGE dated March 21, 2008).

As noted, in reliance on the Corps' advice during discussions, AshBritt [redacted] its prices that had been identified as too [redacted]. But because the Corps, without notice, revised its IGE downward, AshBritt's final revised prices for [redacted] suddenly changed from being [redacted] the IGE, a competitive advantage, to being [redacted], a competitive disadvantage. AshBritt's altered status for the worse occurred without any action on its part – it resulted solely from the Corps' revising its IGE after the fact. [redacted], below AshBritt's original price and well below its revised price. With this change, AshBritt's price proposal for this CLIN was instantaneously converted to [redacted]. (The impact of the Corps' revisions to [redacted] are illustrated by the graph at Exhibit 3.) It was unfair, arbitrary, and capricious for the Corps to decline to hold new discussions, or even to inform AshBritt of the changed IGE, and the Corps' failure to do so renders the August discussions misleading and not meaningful.

Moreover, following its revisions to the IGE, it appears that the Corps, in its final evaluation process, abandoned the IGE altogether. While the Corps advised AshBritt that its initial prices for [redacted], the Corps ultimately awarded the contracts to offerors whose proposed prices were [redacted] than AshBritt's initial prices for these CLINs. (This is illustrated by the graph at Exhibit 4.) Indeed, in every geographic region, the contract awardee's price for at least one of these CLINs was [redacted] than the price that the Corps told AshBritt was [redacted], demonstrating that the IGE no longer held sway or had any meaning at all for the Corps in conducting its evaluations. The Corps, of course, failed to notify AshBritt that it had since abandoned the IGE on which it based its discussions and on which it had advised AshBritt about its initial price proposals, nor did the Corps provide AshBritt with new discussions.

Where a procuring agency chooses to conduct discussions based on an IGE, it is impermissible for the agency to later abandon that IGE in favor of competitively-based pricing without providing an opportunity for offerors to revise their prices accordingly – the decision to abandon the IGE renders the discussions based thereon misleading. The GAO held in *Ranor, Inc.*, B-255904, 94-1 CPD ¶ 258, Apr. 11, 1994:

> [A]lthough the agency had repeatedly advised Ranor that its price was too low based upon a comparison with the government estimate, the agency, in its award decision, abandoned its earlier concern about price in relationship to the government estimate and made award to an offeror whose price approximated the protester's . . . previously offered prices. Given the actual basis for the award [comparison with the other offers received], the agency's advice . . . was misleading.

*See also DTH Management Group*, B-252879, 93-2 CPD ¶ 227, Oct. 15, 1993 (finding that the agency misled an offeror by advising that its initial price was low compared with the government estimate, where the agency subsequently abandoned its concern about the prices in relation to the

REDACTED VERSION

IGE and accepted a price that was lower than the offerors'). The Corps' conduct here is precisely what the GAO found impermissible in *Ranor* and *DTH Management*. The Corps' decision first to revise, and then to abandon, the IGE renders misleading its discussions with AshBritt based on the IGE.

**3. AshBritt Should Have Been Afforded an Opportunity to Revise its Prices When the Corps Revised and/or Abandoned its IGE.**

Where there has been a material discussion flaw, such as here with regard to the IGE, it would be improper to speculate regarding the changes that offerors might have made to their prices in the absence of that flaw; rather, the proper remedy is to reopen negotiations, conduct meaningful discussions, request new prices, and make evaluations based upon the revised proposals. *See Ranor, Inc.*, B-255904, 94-1 CPD ¶ 258, Apr. 11, 1994 (recommending that the agency request revised offers where agency abandoned IGE on which it had based discussions). *See also Lockheed Martin Corp.*, B-293679, 2004 CPD ¶ 115, May 27, 2004; *see generally,* Section IV.C.3., *supra*.

**E. The Corps Conducted Inadequate Discussions Regarding the Automated Debris Management System**

One of the largest and most complicated aspects of the ACI solicitation is its requirement for an Automated Debris Management System ("ADMS"), an electronic ticket system designed to eliminate the need for the hundreds of thousands or millions of paper load tickets (for each truck load of debris brought to a disposal site) previously generated during a major debris removal mission. Because the Corps had not utilized such an automated system in earlier ACI contracts and any system that could meet the Solicitation requirements would be relatively new to the industry, the Corps had significant difficulty determining a reasonable government

REDACTED VERSION

estimate for the ADMS and acknowledged that further discussions with the offerors regarding the ADMS would be necessary. Yet such discussions never took place.

The Corps revisited the complications surrounding ADMS numerous times. Following an unsuccessful first attempt to have offerors submit ADMS pricing, the Corps threw out consideration of ADMS altogether for purposes of determining the competitive range. AR Tab 9 at 385. The Corps then reissued a new CLIN structure for CLIN 0005, ADMS, while still leaving open the possibility that the ADMS requirement would be permanently removed from consideration. AR Tab 18 at 477 [redacted]).

Significantly, in its Revised Initial Evaluation Report, the Corps stated,

> [redacted]

AR Tab 28 at 573 (emphasis added). The Corps ultimately included ADMS pricing in its review of the final proposal revisions of offerors in the competitive range, and thus must have determined that the issues and complications surrounding ADMS had been properly resolved. Yet the Corps never held the additional discussions referenced in the Revised Initial Evaluation Report.

Moreover, multiple citations in the Administrative Record reflect the Government's own opinion that further discussions with all offerors would be required to reach an accurate and meaningful conclusion on ADMS pricing. For example, based on its comparison of the ADMS pricing among the offerors in the competitive range, the Corps noted, in bold print: "[redacted]

REDACTED VERSION

[redacted] AR Tab 38 at 716 n. 1.

The Corps further noted, [redacted] *Id.* at 717 n. 3.[21]

The Corps' recognition of the need to hold further discussions, but failure to follow through and conduct such discussions, constitutes a failure on the part of the Corps to hold meaningful discussions. *See Gentex Corp.*, 58 Fed. Cl. 634 ("As GAO has observed, '[w]here an agency fails to resolve an ambiguity during discussions which should have been reasonably detected and which materially prejudices an offeror, the agency has failed in its obligation to conduct meaningful discussions.'"). FAR § 15.306(d)(2) provides that, "The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation." In light of this provision, it was unreasonable for the Government to fail to hold further discussions with offerors, even after having clearly noted the necessity for such discussions. Additional discussions were reasonably necessary to "maximize the Government's ability to obtain [the] best value." *Id.*

**F. AshBritt is Entitled to Summary Judgment Regarding the Corps' Failure to Enforce The Explicit Solicitation Requirement That All Prices Be Fully Burdened.**

Under the terms of the Solicitation, all proposed prices *must* be fully burdened with indirect costs and profit, and those fully burdened prices are to form the basis for the price

[21] The DCAA also recognized the need for additional discussions regarding ADMS: [redacted] AR Tab 27 at 560.

REDACTED VERSION

evaluation factor. Section B.1 of the Solicitation, which sets forth the Schedule B CLINs for evaluation, provides, "The rates shall be fully burdened with indirect cost and profit." Proposed Findings of Uncontroverted Fact ("PF"), ¶ 1; AR Tab 5 at 212. By using the mandatory "shall," the Solicitation makes plain that fully burdening is not optional, but is a firm Solicitation requirement. Nevertheless, with regard to at least one significant line item, CLIN 0005, it is indisputable that several winning offerors did *not* burden their prices with indirect costs *or* profit, but rather simply passed on their vendor costs unaltered. CLIN 0005 is a major cost item – operation of the ADMS – that accounts for nearly [redacted] of some offerors' total pricing. The Corps' failure to enforce this Solicitation requirement consequently had a major impact on its overall price evaluations.

Inexplicably, in at least one instance the Corps' discussion notes reveal that the Corps actually *advised* a winning offeror to violate the Solicitation by submitting its ADMS pricing unburdened.[22] The Corps should have enforced the express terms of the Solicitation by disqualifying as non-responsive those proposals that contained unburdened pricing, and it certainly should not have advised an offeror to violate the Solicitation. Instead, the Corps arbitrarily and capriciously ignored this Solicitation requirement with regard to certain offerors, to the detriment of offerors like AshBritt that adhered to the Solicitation requirements and fully burdened their prices.

Currently, there only is one ADMS system on the market that meets the requirements of the Solicitation. That system, "HaulPass," is available through Malcolm Pirnie, Inc., who

[22] The Corps' discussion notes with respect to XPERTS, Inc. state: [redacted] AR Tab 18 at 479 (emphasis added).

provides the system by working with the Stratix Corporation. Malcolm Pirnie thus was the ADMS vendor used by all of the offerors in the competitive range. PF, ¶ 2. Malcolm Pirnie has confirmed that it provided each offeror with the identical costs for the system [redacted] Declaration of Jim Loomis, ¶ 2 (attached to AshBritt's Proposed Findings of Uncontroverted Fact). As Malcolm Pirnie stated in an e-mail dated September 6, 2007, it provided [redacted] *Id.*

Accordingly, all of the offerors in the competitive range had the exact same vendor costs for CLIN 0005, [redacted].[23] PF, ¶ 3. In conformance with Solicitation requirement, AshBritt burdened this vendor cost with reasonable indirect costs and profit and submitted a proposed price for [redacted]. AR Tab 2 at 56. Two other offerors, [redacted] likewise submitted burdened ADMS price proposals [redacted]. *Id.* However, at least three offerors – [redacted] – failed to burden their ADMS price proposal [redacted] Instead, their ADMS price proposals for CLIN 0005 are [redacted] PF, ¶ 4; AR Tab 2 at 56; Tab 51; Tab 52; Tab 55. The following table shows each winning offeror's final price proposal for CLIN 0005, leaving no doubt that [redacted] (PF, ¶ 5):

[23] CLIN 0005 consists of five subCLINs. The vendor costs and price proposals discussed in this Section are the sum total of the subCLINs.

| Contractor | Total FPR Price of CLIN 0005* |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

*Sum of five SUBCLIN extended values.

Yet the Corps nonetheless awarded contracts to each of the three offerors that failed to follow the Solicitation's clear instruction to fully burden their price proposal. Those proposals failed to conform to the requirements of the Solicitation and should properly have been rejected as non-responsive. *See* FAR § 14.301(a) ("To be considered for award, a bid must comply in all material respects with the invitation for bids."); FAR § 14.404-2(a) ("Any bid that fails to conform to the essential requirements of the invitation for bids shall be rejected.")

The Corps may attempt to argue that even where a solicitation expressly requires that rates be fully burdened, an offeror may make the competitive decision not to burden these rates at all, or even to negatively burden them. In *GTSI Corp.,* B-286979, 2001 CPD 55 (March 22, 2001), the GAO took that view based on the "long-standing premise that a below-cost bid or offer is permissible in a fixed-price environment . . . [and] we have applied this principle in cases like this one where the solicitation expressly requires that the labor rates be fully-burdened." *Id.* at 4. However, this Court has never adopted that position, nor, AshBritt submits, should it. The GAO's holding that an offeror may elect not to burden even where a solicitation explicitly requires fully burdened prices fails to give meaning to the terms of the Solicitation and effectively reads that requirement out of the Solicitation. Indeed,

REDACTED VERSION

> "It is a well established rule of contract interpretation that 'all provisions of a contract are to be given effect and no provision is to be rendered meaningless.' *United Pacific Insurance Co. v. United States*, 204 Cl. Ct. 686, 692 (1974). Moreover, as the Court of Claims stated in *Astro-Space Laboratories, Inc. v. United States*, 200 Cl. Ct. 282, 295 (1972): 'It is difficult to understand how plaintiff can urge an interpretation which would require the elimination of at least one word as reasonable. Indeed this is the type of interpretation that has consistently been found to be unreasonable.' *Jamsar, Inc. v. United States*, 194 Cl. Ct. 819, 827 (1971); *Hol-Gar Mfg. Corp. v. United States*, 169 Cl. Ct. 384, 395 (1965)."

*Raytheon Co. v. United States*, 2 Cl. Ct. 763, 770 (1983).

The GAO's construction in *GTSI* is an unnatural and illogical reading of the solicitation that is directly at odds with the plain meaning of the contract language. It would foster confusion, create ambiguities, and put offerors in an untenable position, as they would reasonably construe the solicitation to require *some* positive burdening, but would be underbid if one offeror elected to ignore the solicitation's express terms. If an agency's intent were to permit unburdened prices, there are a number of phrases that the agency could have used to clearly communicate that intent.

Although this Court has not squarely decided the issue, past precedent indicates that the Court would not view favorably the GAO's construction as expressed in *GTSI.* In *Mantech Telecommunications and Information Systems Corp. v. United States*, 49 Fed. Cl. 57 (2001), like here, an offeror ignored a solicitation requirement to fully burden its prices, and this Court assumed (without deciding) that the failure to "fully load" the prices was a violation of the solicitation. *Id.* at 70-71. It is not surprising that the *Mantech* Court would have made this assumption, or that the parties would not object, as that is consistent with the natural reading of the solicitation and honors the rule of construction that all terms be given meaning and effect. The approach adopted by the GAO, on the other hand, effectively reads in to the Solicitation an

REDACTED VERSION

unstated exception to the Solicitation's express requirements, resulting in an unlevel playing field for different offerors. This is precisely the situation that FAR § 14.301(a) sought to avoid.

Moreover, by advising [redacted] not to burden its ADMS price in violation of the Solicitation but not so advising [redacted], the Corps engaged in unequal discussions in violation of FAR § 15.306(e)(1). *See* Section IV.E., above. These unequal discussions had a demonstrably adverse effect on AshBritt's competitive position – [redacted] unburdened ADMS price virtually is the sole difference between AshBritt's overall price proposal being [redacted] price proposal in Region [redacted] [redacted], as demonstrated in the following table:

| | | |
|---|---|---|
| | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

Had [redacted] adhered to the Solicitation and imposed a standard burden upon its ADMS cost, AshBritt's price in that region likely would have been [redacted]

### G. The Corps Failed to Apply the Evaluation Criteria Identified in the Solicitation when Awarding the Reach Back Contracts.

The Solicitation does not establish different evaluation criteria for primary and reach back contracts, but rather expressly states that the *same* evaluation criteria will be used: "Selection of reach back firms for every regions will be based on how an offeror's proposal fared in the evaluation for that region . . .." AR Tab 5 at 317 (Section M.2). The Solicitation provides that primary and reach back contracts will be selected "using the 'Best Value' method of Source Selection" based on "price and other factors considered. This will be determined by evaluation of the offerors' proposals based on criteria set forth in Sections L and M of the Request for Proposals." *Id.* (Section M.1). Section M.5, in turn, establishes five selection criteria:

REDACTED VERSION

FACTOR 1 – PAST PERFORMANCE
FACTOR 2 – MANAGEMENT /OPERATIONS PLAN
FACTOR 3 – SMALL BUSINESS SUBCONTRACTING PLAN
FACTOR 4 – TECHNICAL APPROACH TO SAMPLE TASK ORDER
FACTOR 5 – PRICE

*Id.* at 318.

Thus, in order to conduct a best value determination and to apply all of the five evaluation factors, the Solicitation requires that price be included as a factor in awarding the reach back contracts as well as the primary contracts. However, in violation of the Solicitation, the Corps failed to include price in its evaluations of the proposals for the reach back contracts. *See* AR Tab 21 at 518 (Source Selection Decision Document dated January 24, 2008) [redacted] (emphasis added); *see also* AR Tab 33 at 623 (Source Selection Decision Document dated April 8, 2008) (providing the same).

The decision to select reach back contractors purely on the basis of technical evaluation factors is a clear departure from the Solicitation's stated evaluation factors, in violation of the FAR and well-established case law.[24] Moreover, because, as discussed in the sections above, the

[24] *See* FAR § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation"); FAR § 15.304(d) ("A solicitation must clearly state all significant factors and subfactors as well as their relative importance"); 10 U.S.C. § 2305(b)(1) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); *Banknote Corp. of America v. United States*, 56 Fed. Cl. 377, 386 (2003) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."); *ITT Federal Services Corp. v. United States*, 45 Fed. Cl. 174, 194 (1999) ("A contract award may not be upheld when the source selection authority (SSA) improperly departs from stated evaluation criteria in a solicitation."); *Dubinsky v. United States*, 43 Fed. Cl. 243, 266 (1999) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

offeror's price proposals are irreversibly tainted by the Corps' unequal and misleading discussions and other flaws in the procurement process, it is not possible to determine how AshBritt would have fared under the reach back evaluations if price were properly considered, nor is it permissible to speculate. Rather, this error can be remedied only by conducting a new evaluation for the reach back based on revised price proposal. *See* Section IV.C.3., *supra*.

## V. ASHBRITT IS ENTITLED TO INJUNCTIVE RELIEF.

In addition to the declaratory relief sought, AshBritt also is entitled to the permanent injunctive relief set forth in its Motion, requiring the Corps to re-evaluate the proposals in the regions in which AshBritt was not awarded a contract based upon the proper rating of AshBritt's small business subcontracting plan and new price proposals untainted by the Corps' flawed discussions and evaluation. AshBritt's request meets the standards for the granting of injunctive relief.

### A. Standard

Because AshBritt can demonstrate that (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to AshBritt if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest, a permanent injunction is warranted. *PGBA, L.L.C. v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citations omitted); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Although "[n]o one factor, taken individually, is necessarily dispositive," *FMC Corp.*, 3 F.3d at 427, a review of these factors indicates that permanent injunctive relief is warranted in this case.

### B. Likelihood of Success on the Merits

As established in the preceding sections of this memorandum, AshBritt should prevail on the merits of its protest, having demonstrated that the Corps' evaluation and award of the ACI contracts, based on misleading, unequal, and unfair discussions, was arbitrary and capricious, without rational basis, an abuse of discretion, and that it clearly violated federal procurement law and regulations. *See* 28 U.S.C. § 1491(b)(4) (referencing the standards set forth in 5 U.S.C. § 706).

Moreover, AshBritt was unfairly prejudiced by the Corps' conduct. Prejudice is a question of fact and to demonstrate this prejudice, AshBritt "must show that there was a 'substantial chance' [sic] it would have received the contract award but for [that] error . . ." *Bannum,* 404 F.3d at 1353 (citations omitted); *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)); *see also OTI Am., Inc. v. United States*, 73 Fed. Cl. 758, 767 (2006). This "substantial chance" standard is lenient and does not require proof that but for the errors, AshBritt necessarily would have won the contract. *See Bannum, Inc.*, 404 F.3d at 1358. Because of the "domino effect" that would result from any changes to AshBritt's technical rating or its pricing owing to the adjacency limitations on contract awards, and given the fluid nature of the Corps' award decisions across regions, there plainly is a "substantial chance" that had the Corps not made the errors or engaged in the unequal conduct established herein, AshBritt would have been awarded additional contracts.

### C. Irreparable Injury

AshBritt will suffer irreparable injury if it is denied injunctive relief because it will be denied the opportunity to recoup profits and to benefit from a lawful procurement process.

When assessing irreparable injury, the relevant inquiry is whether the plaintiff has an adequate remedy in the absence of an injunction. *Klinge Corp. v. United States*, 82 Fed. Cl. 127, 138 (2008) (quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993)). Absent an injunction, the only other relief available in a bid protest is bid preparation costs. *Id.* However, "[b]id preparation costs have been held inadequate for two reasons: loss of opportunity to earn profits on the contract, and/or failure to have a bid 'fairly and lawfully considered.'" *Id.* (internal citations omitted). AshBritt will be irreparably harmed if the injunctive relief sought is not granted because it will have lost the opportunity to be evaluated on a level playing field and to earn profits on additional contracts it would have been awarded in a fairly conducted process.

**D. Public Interest**

The Federal Circuit has long recognized that the public interest lies in honest, open and fair competition in public procurement. *See PGBA, L.L.C. v. United States,* 57 Fed. Cl. 655, 663 (2003). Further, "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 576 (2004) (citations omitted). The Corps' violations of federal procurement statutes, regulations and policies adversely affect and undermine the integrity of the federal procurement process. Granting injunctive relief here would serve the public interest by furthering the overriding and predominating public concern for preserving fair and open competition and will result in the most efficient and effective ACI contracts possible – *i.e.*, the best value to the government – to be put into place to further the health, safety, and security of the United States.

### E. Balance of Harms

The balance of harms easily favors AshBritt. AshBritt consciously and purposefully chose not to seek a temporary restraining order or a preliminary injunction in these proceedings so that the nation would have ACI contractors ready and in place while AshBritt's protest is heard. Because contracts have been awarded to six offerors in the competitive range, that already have generally mobilized to the extent possible, and because the nature of these contracts requires the bulk of mobilization to be done only once a disaster has struck or is imminent, there will be very little disruption to the ACI program, and very little additional cost to any offerors or the Government, if, as a result of this protest, the contracts are re-shuffled among the offerors in the competitive range and more contracts are awarded to AshBritt. In addition, any mobilization work already undertaken will not result in any waste, as all of the major contractors in this competition can be expected to receive contracts under re-evaluated award decisions, but not in the arbitrary, unreasonable and imbalanced way in which current awards have been made. A delay in awarding the final contracts, by itself, is insufficient to warrant denial of injunctive relief. *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999); *Univ. Research Co., LLC v. United States*, 65 Fed. Cl. 500, 514 (2005); *PGBA, L.L.C.*, 57 Fed. Cl. at 664.

In contrast, AshBritt would suffer serious and irreparable financial harm, as set forth previously in this memorandum, should this Court refuse injunctive relief. The harm caused by a minimal delay in a contract resulting from an injunction is significantly outweighed by the harm AshBritt will suffer if it is illegally and unreasonably denied the opportunity to compete in a valid procurement process.

* * * * *

Consequently, AshBritt's protest grounds satisfy the elements of injunctive relief.

## VI. CONCLUSION

For the foregoing reasons, the Court should grant AshBritt's motion for judgment on the Administrative Record and, with respect to the failure-to-burden issue, summary judgment. It is clear that the Corps failed to conduct a fair and equal evaluation and that the old price proposals have been tainted and cannot be re-used in a new evaluation. The Court thus should require the Corps to properly evaluate AshBritt's small business subcontracting plan, permit new price proposals in each geographic region for which AshBritt did not receive an award, and conduct a new evaluation based on the new pricing for each such region.

Dated: September 8, 2008

Respectfully submitted,

/s/ David J. Taylor______________

David J. Taylor
SPRIGGS & HOLLINGSWORTH
1350 I Street, NW
Washington, DC 20005
Ph: (202) 898-5838
Fax: (202) 682-1639
davidtaylor@spriggs.com

*Counsel of Record for Plaintiff AshBritt, Inc.*

OF COUNSEL:

William J. Spriggs
Stephen A. Klein
Katherine A. Allen
Rachel W. McGuane
Amanda L. Edwards
SPRIGGS & HOLLINGSWORTH