# United States Court of Federal Claims

### No. 08-473C
### (Bid Protest)
### (Filed Under Seal: June 15, 2009)[1]
### (Reissued: June 25, 2009)

* * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| ASHBRITT, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| UNITED STATES OF AMERICA, | * |
| | * |
| Defendant, | * |
| and | * |
| | * |
| CERES ENVIRONMENTAL | * |
| SERVICES, INC. and | * |
| ENVIRONMENTAL CHEMICAL | * |
| CORPORATION, | * |
| | * |
| Intervenors. | * |

Post-Award Bid Protest; Motion for
Judgment on the Administrative Record;
Motion for Summary Judgment; RCFC
52.1, Supplementation of the
Administrative Record; Unequal,
Misleading Discussions; Evaluation
Consistent with Solicitation; Price
Evaluation; Prejudice; Permanent
Injunctive Relief; Bid and Proposal
Preparation Costs.

* * * * * * * * * * * * * * * * * * * * * *

David J. Taylor, Buchanan, Ingersoll & Rooney, 1700 K Street, N.W., Washington, D.C. for Plaintiff. William J. Spriggs, Katherine A. Allen, and Rachel W. McGuane of Buchanan, Ingersoll & Rooney and Stephen A. Klein and Amanda L. Edwards of Hollingsworth, LLP, Of Counsel for Plaintiff.

Gregory G. Katsas, Jeanne E. Davidson, Todd M. Hughes, and David A. Levitt, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, 1100 L Street, N.W., 8th Floor, Washington, D.C., for Defendant. Thomas J. Warren and William G. Meiners, U.S. Army Corps of Engineers, Of Counsel for Defendant.

---

[1] The Court issued this opinion under seal on June 15, 2009, and directed the parties to file any proposed redactions to the opinion by June 22, 2009. The opinion issued today incorporates certain of the parties' proposed redactions, correcting errata. This redacted material is represented by brackets "[]."

Karl F. Dix, Smith, Currie & Hancock, LLP, 2700 Marquis One Tower, 245 Peachtree Center Avenue, N.W., Atlanta, Georgia, for Intervenor Ceres Environmental Services, Inc. Steven L. Reed and John S. Tobey, Of Counsel for Intervenor.

Richard B. Oliver, McKenna Long & Aldridge LLP, 444 South Flower Street, Suite 800, Los Angeles, California, for Intervenor Environmental Chemical Corporation, Inc. Alison L. Doyle and Brian Cruz, Of Counsel for Intervenor.

---

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD IN PART
AND ENTERING INJUNCTION**

---

**WILLIAMS**, Judge.

In this post-award bid protest, Plaintiff, AshBritt, Inc. ("AshBritt") challenges the awards of several contracts by the United States Army Corps of Engineers under its Advance Contracting Initiative ("ACI") program, assigning debris removal contractors for designated regions of the country in anticipation of a natural or man-made disaster. This matter comes before the Court on the parties' cross-motions for judgment on the Administrative Record ("AR") and on AshBritt's motion for a permanent injunction.[2]

Under the ACI program, the agency awarded a primary contract for ten geographic regions and a back-up assignment, known as a "reach back" assignment, for nine regions. The reach back assignee could be activated in the event of a major disaster, or a failure on the part of the primary contractor either to provide adequate services or to negotiate fair and reasonable task order pricing. Offerors could submit proposals for any or all regions and were eligible to receive multiple awards, subject to a proscription against awardees receiving contracts in adjacent regions.

AshBritt challenges the primary awards in three regions and the reach back assignments in five regions, alleging numerous illegalities in the selection process.[3] First, AshBritt argues that the

---

[2] AshBritt did not seek temporary injunctive relief and has agreed that the current contracts should remain in place pending the outcome of any court-ordered relief. Defendant, as well as Intervenors Ceres Environmental Systems, Inc. ("Ceres") and Environmental Chemical Corporation ("ECC"), filed cross-motions for judgment on the AR. Plaintiff also attempted to seek summary judgment on one claim, but the Court disallowed that procedure. See Tr. (May 1, 2009) at 5.

[3] AshBritt challenges the primary contract awards in Regions 5, 6A, and 6B, and the reach back assignments in Regions 2C, 4, 5, 6A, and 6B. The agency selected AshBritt as the primary contractor for Region 2B, encompassing Georgia, North Carolina, and South Carolina, and as the

agency's evaluation of subcontracting plans was arbitrary and capricious in three respects. AshBritt, which received the second highest rating of "Good," alleges that it received lower scores on its small business subcontracting plan than another offeror with a comparable plan, that discussions concerning subcontracting goals for Historically Black Colleges and Universities / Minority Institutions ("HBCU/MIs") were unequal and misleading, and that AshBritt received no credit for revisions made to its subcontracting plan. Second, AshBritt argues that the agency engaged in unequal and misleading discussions regarding the prices for several contract line item numbers ("CLINs") and claims that these discussions induced AshBritt to offer higher prices than its competitors in relation to the Independent Government Estimate ("IGE"). Third, AshBritt submits that the agency revised the IGE without advising offerors or reopening discussions. Fourth, AshBritt contends that the agency conducted inadequate discussions regarding the pricing of an automated ticketing and tracking system to be employed during debris removal. Fifth, AshBritt argues that the agency departed from the terms of the solicitation by failing to evaluate price in its selection of reach back assignments. Finally, AshBritt contends that the agency disregarded the evaluation criteria in the solicitation by failing to reject offers containing unburdened pricing.

The Court concludes that the agency's discussions regarding HBCU/MIs and pricing were unfair and misleading, that the agency failed to document its evaluation of AshBritt's revised subcontracting plan, and that the agency departed from the solicitation by failing to evaluate price in awarding reach back assignments. Finding that these errors were prejudicial and that AshBritt has satisfied the requirements for injunctive relief, the Court grants Plaintiff's motion for a permanent injunction, directing the agency to reprocure the services at issue in accordance with statute and regulation. However, recognizing the critical need that contractors remain in place while the agency takes corrective action, the Court does not enjoin performance of the ongoing contracts pending completion of any reprocurement.

## Findings Of Fact[4]

### The Solicitation

On June 23, 2007, the agency issued Request for Proposals ("RFP") number W912P8-07-R-0101 seeking specified equipment, operators, and laborers for the removal of debris originating from any natural or man-made catastrophe or disaster in 10 geographic regions and sub-regions. AR at 209, 218. For each region, an Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract would be awarded at a firm-fixed-price for a single base year with four one-year option periods, limited to a maximum of $50 million per year and $250 million over the life of the contract. AR at 210-11, 218,

---

reach back assignee for Region 3, which included Mississippi and Louisiana.

[4] These findings are derived from the AR as supplemented, and the Court's record on prejudice and injunctive relief. The Court granted Plaintiff's motion for leave to supplement the AR with the offerors' subcontracting plans and Defendant's motion for leave to supplement the AR with portions of the May 6, 2009 declaration of the Contracting Officer.

317.  The solicitation also provided a minimum guarantee of $10,000 for the life of each regional contract awarded, regardless of whether any services were ordered.  AR at 232.

The geographic areas for which contracts were to be awarded were:

<u>North Atlantic Division</u>

Region 1:  New Jersey, New York, Pennsylvania, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine, Maryland, Delaware, District of Columbia, Virginia, West Virginia

<u>South Atlantic Division</u>

Sub-Region 2A:  Alabama, Florida

Sub-Region 2B:  Georgia, North Carolina, South Carolina

Sub-Region 2C:  Puerto Rico

Sub-Region 2D:  Virgin Islands

<u>Mississippi Valley Division</u>

Region 3:  Louisiana, Mississippi

<u>Southwestern Division</u>

Region 4:  Texas, Oklahoma, Arkansas

<u>South Pacific Division</u>

Region 5:  California, Utah, Nevada, Arizona, New Mexico

<u>Pacific Ocean Division</u>

Sub-Region 6A:  Hawaii

Sub-Region 6B:  Alaska

AR at 233.

4

Prospective offerors were permitted to compete for any region. Id. However, the solicitation imposed geographic limitations on the award of multiple contracts. First, no single offeror could receive awards for adjacent regions. Id.[5] Second, as clarified in Amendment 0001 to the solicitation, offerors were limited to the award of a single primary contract for each geographic division -- i.e., in the South Atlantic Division, which encompassed Regions 2A, 2B, 2C, and 2D, an offeror could only receive one primary contract. AR at 339.

Award was to be made using the "best value" tradeoff process. AR at 317-18. The solicitation stated that, "[p]roposal evaluation factors shall be rated in accordance with the criteria set forth in the Army Source Selection Manual" and provided an internet link to this document. AR at 317. The Army Source Selection Manual, Appendix AA to the Army Federal Acquisition Regulation Supplement ("AFARS"), explained the source selection authority's assessment of best value as follows: "To determine which proposal provides the best value, the [source selection authority] must analyze the differences between competing proposals. This analysis must be based on the facts and circumstances of the specific acquisition." AFARS Appendix AA at 39. The Army Source Selection Manual further provided:

> The tradeoff process, or tradeoff analysis, compares the strengths and weaknesses of the competing proposals to determine which proposal(s) represent(s) the best value to the Government and thus shall receive contract award. . . .
>
> Tradeoff analysis is a subjective process in that it requires the [source selection authority] to exercise reasonable business judgment. When performing this analysis, consider each proposal's total evaluated price and the discriminators in the non-cost ratings as indicated by each proposal's strengths, weaknesses, and risks. Consider these differences in light of the relative importance of each evaluation factor.

AFARS Appendix AA at 40-41.

The solicitation established five evaluation factors: (1) Past Performance, (2) Management/Operations Plan, (3) Small Business Subcontracting Plan, (4) Technical Approach to Sample Task Order, and (5) Price. AR at 318-19. As to the relative importance of the five evaluation factors, the solicitation stated, "[t]he evaluation factors, other than cost or price, when combined, are significantly more important than cost or price. The relative importance of each of the non-cost factors is comparatively equal. The sub-factors of each non-cost factor are comparatively equal." AR at 318.

_____

[5] The solicitation treats the terms "sub-region" and "region" interchangeably, as do the parties. See, e.g., AR at 233 (referring to 2C as both a region and a sub-region).

5

Regarding discussions, the solicitation stated that, "[t]he Government intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR 15.306(a)). . . . The Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary." AR at 314.

The small business subcontracting plan was to "be evaluated for compliance with AFARS, Appendix DD" -- the Army's Subcontracting Plan Evaluation Guide -- "and the goals presented in section L of the Solicitation." AR at 318. AFARS Appendix DD provided a methodology for uniform and consistent evaluation of subcontracting plans within the Army and was designed to facilitate compliance with statutory requirements to increase opportunities for small and small disadvantaged businesses. AR at 738.

AFARS Appendix DD established a scoring system for subcontracting plans that consisted of seven factors, each with an assigned point range, as follows:

AFARS Appendix DD Scoring Criteria

1.  Policy statement or evidence of internal guidance to company buyers recognizing commitment to Pub. L. 99-661, Section 1207, and Pub. L. 100-180, Section 806 [0 - 5 points]

2.  Efforts to broaden SB and SDB active vendor base [0 - 10 points]

3.  Outreach [0 -10 points]

4.  Describes supplies and services to be subcontracted and planned for subcontracting to SBs, SDBs, HBCUs and MIs [0 - 10 points]

5.  Describes specific efforts, based on results of efforts described in Elements No. 3 and No. 4 to ensure that SB, SDB, HBCU and MI concerns have equitable opportunity to participate in acquisitions [0 - 15 points]

6.  Development of percentage goal is based on planned subcontracting which is challenging yet realistic [0 - 40 points]

7.  Past performance [0 - 10 points]

AR at 739-43.

Section L of the solicitation set forth the small business subcontracting goals as a percentage of dollars to be subcontracted to each of the following small business designations:

Subcontracting Goals

| | | |
|---|---|---|
| • | Small Business (SB) | 75% |
| • | Small Disadvantaged Business (SDB) | 14% |
| • | Women-Owned Small Business (WOSB) | 12% |
| • | HUBZone Small Business | 10% |
| • | Service-Disabled Veteran-Owned Small Business (SDVOSB) | 7% |
| • | Veteran-Owned Small Business (VOSB) | 9% |
| • | Historically Black Colleges and Universities / Minority Institutions (HBCU/MI) | 0% |

AR at 310.

Offerors were to submit their price proposals on a separate Schedule B rate schedule for each region for which they wished to compete. AR at 212.[6] Section M.5 of the solicitation stated that "[a] separate price evaluation will be completed for each region" and required offerors to submit prices "for every region for which they wish to be considered." AR at 319. Each CLIN was to have an "extended value" -- the proposed unit price multiplied by the solicitation's estimated quantity -- and the sum of the extended value of the offerors' proposed rates on Schedule B would determine the low-priced offeror for each region. Id. Schedule B included 29 CLINs for various debris removal services, broken out by the type of equipment to be used, such as dump trucks, wheel-loaders, and knucklebooms. AR at 212-15.

Under the contract, the agency could issue task orders using firm-fixed-price, time and materials, or hybrid pricing. AR at 212. The solicitation stated that "[t]he Government intends to issue the majority of the task orders as firm-fixed price." AR at 319. For most of the 29 CLINs on Schedule B, the agency requested an hourly rate for the desired service, and instructed offerors to submit both firm-fixed-prices and time and materials rates, but only the firm-fixed pricing was to

---

[6] Each offeror also submitted a response to a sample task order based upon a mock hurricane event in North Carolina. AR at 292-301. This sample task order was to be used to assess proposal risk and price/cost realism, but the best value tradeoff and the determination of the low offeror for each region would be based upon the Schedule B rates. AR at 319.

be used in the price evaluation.  AR at 212-15, 319.[7]  The solicitation instructed offerors to submit rates for the base period only.  AR at 212.  The Schedule B instructions stated that "[t]he rates shall be fully burdened with indirect cost and profit."  Id.

CLINs **[          ]** and **[          ]** related to the Automated Debris Management System ("ADMS"), an electronic system for tracking and verifying debris removal during an operation.[8]  The solicitation provided detailed guidance on system parameters, architecture, and functional specifications, and required contractors to implement the ADMS within 30 days.  AR at 218, 278-85.

Offerors were instructed to indicate their willingness to participate in the reach back program and to identify any regions in which they wished to participate.  AR at 317.  Reach back contractors for a region could be activated in any of three circumstances: 1) if a single event generated in excess of 10M cubic yards of debris, 2) if the regional primary contractor had two or more performance evaluations with a score of 50 or less on any task order, or 3) if the Government was unable to negotiate fair and reasonable prices with the primary contractor for the task orders.  Id.[9]

The solicitation addressed the reach back selection process as follows:

> The assignment of reach back responsibilities will occur during the selection process.  Selection of reach back firms for every region will be based on how an offeror's proposal fared in the evaluation <u>for that region</u> and if the offeror expressed interest in the program.  The determining factor is that the offeror will have to receive an award in another region.  Further, the offeror will have to win in a non-adjacent region.

---

[7] Offerors were not required to submit time and materials rates for five CLINs -- **[   ]**, **[   ]**, **[   ]**, **[   ]**, and **[   ]** -- as the solicitation stated the Government would only order these items based on firm-fixed pricing.  AR at 212-15.

[8] The purpose of the ADMS system was to create electronic load tickets for verifying the progress of debris removal operations, eliminating the need for handwritten, scanned tickets.  AR at 278.  The system would utilize handheld devices to enter and read data from "smart cards" -- removable electronic memory chips -- and featured global positioning system capability for debris tracking.  See AR at 278-85.

[9] The solicitation addressed performance evaluations as follows: "The Government will perform an evaluation every two weeks during the performance period of task orders.  In the event the contractor's score is below the negotiated thresholds established in the Performance-Based Contracting Matrix, "the contractor's invoice, for that specific period of performance, shall receive a deduction in earnings as agreed to in the task order."  AR at 235.

Id. (emphasis added).  The agency reserved the right to decline to choose a reach back assignee in any region if in the Government's best interest.  Id.

Offerors bidding for the primary contract in a given region were to indicate their willingness to serve as the reach back assignee for that region by checking a box on their Schedule B form for that region.  See AR at 216.

**The Source Selection Plan**

On July 20, 2007, the agency issued a Source Selection Plan pursuant to the Army Source Selection Manual.  AR at 745-82.  According to the Army Source Selection Manual, the Source Selection Plan was "a required and vital planning document that identifie[d] the goals of the acquisition and describe[d] how to evaluate proposals and select the winning offeror(s)."  AFARS Appendix AA, at 11.  Regarding the reach back selection process, the Source Selection Plan stated:

> Offerors are also asked to submit regions that they want to be considered for a reach back assignment with the understanding that only contractors receiving [primary] awards for a geographic region will be assigned to a reach back region.  Further, reach back will be for a non-adjacent region.  For example, Region 3's 2nd ranked offeror wins Region 1.  The SSA would assign the Region 1 contractor as Region 3's back up.

AR at 745.

**The Initial Evaluation Of Proposals**

On July 23, 2007, the agency prepared an IGE of expected rates for each of the 29 CLINs under the solicitation.  AR at 391-98.

Twenty-three offerors submitted proposals.  AR at 381.  On August 20, 2007, the Source Selection Evaluation Board ("SSEB") issued its Initial Evaluation Report.  AR at 379-90.  The price evaluation team "noticed right away that the prices proposed to operate the [ADMS] were not consistent." AR at 385.  For example, the proposed prices for CLIN **[   ]** -- operation of the ADMS during an event -- ranged from $ **[      ]** to $ **[      ]** across regions.  Id.  The IGE had estimated a price for CLIN **[   ]** of $ **[      ]**.  See AR at 392.

In order to effect a better comparison of the offers, the SSEB removed CLINs **[   ]** and **[   ]** from the evaluation.  AR at 385.  The SSEB concluded, "[d]ue to problems experienced during the price/cost evaluation of ADMS, the SSEB cannot formulate a final rating for these offers.  Discussions are needed to improve understanding of the ADMS requirements, provide feedback to the offerors on their strengths and weaknesses, and increase the overall value of the offers."  AR at 390.

9

**The DCAA Review Of The IGE**

On August 20, 2007, the Defense Contract Audit Agency ("DCAA") for the Gulf Coast Branch Office issued a report containing the results of an on-site review of the agency's price analysis for the project. AR at 399-401. In its review, the DCAA found that the pricing models provided "sufficient details needed for a comparative analysis between the competitors and the [IGE] at the summary level and by [CLINs]." AR at 399. The report found no significant mathematical or logic errors but did identify three "potential problem areas" with regard to the ADMS pricing, the IGE for CLINs [   ] and [   ], and the mock hurricane price analysis. AR at 400. Regarding the ADMS system, the DCAA stated that "[i]n the base period price analysis model . . . a serious pricing discrepancy exists for the [ADMS]," and noted that "[b]id prices range from [      ] to [      ], while the IGE is approximately $[      ]." Id. The DCAA also noted that "most bidders are approximately [          ] below the IGE for CLINs [   ] and [   ] and that "in the mock hurricane price analysis model . . . the IGE of $[      ] is significantly more than the bid estimates for most bidders." Id.[10] The DCAA concluded:

> We believe the price analysis process can be enhanced by further review of the requirement for ADMS in [the solicitation]. We recommend further analysis of the IGE to identify the basis/criteria for pricing. We also believe additional effort is needed to determine why there is such a significant range in the bid estimates for ADMS (are the bidders using different systems, different criteria, different operating requirements, etc.). The government should perform additional price analysis to increase the accuracy of the IGE and perhaps provide further guidance to the bidders on how to estimate the cost for ADMS.

Id.

**Discussions With Offerors In The Competitive Range**

On August 21, 2007, the agency selected the eight "most highly rated" proposals for the competitive range, based upon "an integrated assessment utilizing all stated evaluation factors and a proposal risk analysis." AR at 402. These offerors were: AshBritt; Ceres; ECC; Crowder Gulf; Phillips & Jordan; Xpert's, Inc. ("Xpert's"); BGM-Ceres Environmental JV ("BGM-Ceres"); and Ceres Caribe-Ceres Environmental JV ("Caribe-Ceres"). AR at 404.[11] After this selection, each

---

[10] CLIN [   ] was for the use of a 16-24 cubic yard capacity dump truck. AR at 212. CLIN [   ] was for the use of a 25-45 cubic yard capacity dump truck. Id.

[11] In Region 2C, Ceres submitted its proposal as part of the Caribe-Ceres joint venture. AR at 614, 980-94. In Region 2D, Ceres submitted its proposal as part of the BGM-Ceres joint venture. AR at 614, 970-79.

region had at least two offerors remaining to ensure competition.  Id.

On August 31, 2007, the agency held oral discussions by telephone with the eight offerors in the competitive range.  AR at 459-76.  The only contemporaneous documentation in the AR of what the agency discussed with each offeror is contained in separate discussion agendas prepared by the Government for each offeror prior to discussions, and a single post-discussion written summary that covered all discussions.  AR at 459-82.[12]  According to the agendas, discussions were to last no longer than 30 minutes.  AR at 459, 462, 465, 468, 471, 474.  The discussion agendas stated that "[t]he Government will discuss deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond.  The Government is not required to discuss every area where the proposal could be improved."  Id.

With regard to subcontracting plans, the respective discussion agendas stated:

AshBritt: "Subcontractors not identified in sufficient detail in the plan."  AR at 460.

ECC: "No discussion on utilizing HBCU/MI."  AR at 469.

Phillips & Jordan: "Unacceptable.  Subcontracting plan does not address HBCU/MI.  Proposal does not include discussion on increasing subcontractor database.  No outreach program.  Did not score 70 points on AFARS Appx DD Checklist.  (Must be made acceptable to award this contract)."  AR at 463.

Crowder Gulf: "Limitation of subcontracting to the second tier."  AR at 475.[13]

The discussion agendas indicated that the agency discussed HBCU/MI subcontracting goals with both ECC and Phillips & Jordan, but not with AshBritt.  See AR at 460, 463, 469.[14]

While the post-discussion summaries did not indicate that HBCU/MI goals were discussed with AshBritt or Phillips & Jordan, the summary for ECC stated, "[                    ] [          ]

---

[12]  The Contracting Officer added references to discussions in his Price Negotiation Memorandum prepared some seven months later, but the Court affords more weight to the contemporaneous documents.

[13]  The discussion agendas for Ceres / BGM-Ceres / Caribe-Ceres and  Xpert's made no mention of subcontracting plans.  AR at 465-67, 471-73.

[14]  None of the parties question the accuracy of the agendas regarding the discussion of HBCU/MI goals with the various offerors.

stated they should list initiatives they would take to engage HBCU/MI." AR at 478, 480-81. With regard to the subcontractor plans, AshBritt's post-discussion summary indicated: "AshBritt wanted to know if [it] should list all subcontractors. [SSEB member] [          ] indicated that AshBritt recognized the need to use local subs, but did not incorporate method into plan."AR at 480.

The agency also discussed pricing with the offerors during the August 31, 2007 discussions. The agency used the IGE as a benchmark during discussions for all pricing except ADMS, and advised offerors whether some CLINs were high or low based upon a comparison with the IGE.[15] According to the discussion agendas, the agency informed AshBritt during discussions of the following pricing issues with regard to AshBritt's proposal:

- Proposed prices for CLINs [    ] and [    ] are unreasonable.

- The following CLINs have prices that are high in comparison to the [IGE]: [    ], [    ], [    ]

- The following CLINs have prices that are low in comparison to the [IGE]: [    ], [    ], [    ], [    ], [    ], [    ], [    ], [    ] and [    ].

AR at 460.

The Ceres discussion agenda stated:

- The following CLINs have prices that are high in comparison to the IGE: [    ], [    ], [    ] and [    ].

- Many of the remaining CLINs have prices that are low in comparison to the [IGE].

- CLIN [        ] seems extremely high.

AR at 466. The ECC discussion agenda stated:

---

[15] To address the discrepancies in the ADMS pricing identified by the DCAA, the agency notified all offerors during the discussions that it had decided to divide CLIN [    ] into five sub-CLINs, and issued a revised Schedule B to reflect this change. AR at 435-39, 460-61, 463-64, 466-67, 469-70, 472-73, 475-77. According to the Contracting Officer, subdividing CLIN [    ] would allow the agency "to provide the offerors with further guidance and information on how to estimate the cost for ADMS." AR at 45. (Statement of Contracting Officer [          ] to GAO). With regard to AshBritt, the post-discussion summary indicated that "Ashbritt likes the revised language for pricing ADMS" and "[a]grees it should lead to more competitive pricing." AR at 480. With regard to Xpert's ADMS pricing, the post-discussion summary stated that Contracting Officer [            ] suggested that Xpert's "go back to the vendor and tell them the cost is unacceptable" and that Xpert's "not add mark-ups to the ADMS pricing." AR at 479.

- The following CLINs have prices that are high in comparison to the IGE: [     ], [     ], [     ], [     ], and [     ].

- Many of the remaining CLINs have prices that are low in comparison to the [IGE].

- ADMS proposed price for CLIN [     ] is higher than the competition. CLIN [     ] seems extremely low.

AR at 469.  The Phillips & Jordan discussion agenda stated:

- Escalation -- The Government normally expects escalation rates to be in a range of [   ]%-[   ]%.

- ADMS validation price for CLIN [     ] is higher than the competition. ADMS pricing for CLIN [     ] -- Seems extremely high.

AR at 463.

The post-discussion summary indicated with regard to Ceres that the "Government identified specific CLINs in the proposal that were high and low." AR at 482.  For AshBritt, Phillips & Jordan, Xpert's, and ECC, the post-discussion summary did not reference any discussion of specific CLINs as being high or low in comparison with the IGE.  AR at 478-82.

## AshBritt's Revised Proposal

On September 4, 2007, the agency requested that offerors in the competitive range submit revised proposals.  AR at 483-90.  The offerors timely submitted revised proposals on September 10, 2007.  AR at 483, 493.

In response to the subdivided CLIN [           ], the offerors' proposed prices ranged from $[           ] to $[     ].  AR at 716.  AshBritt submitted the[                    ] for CLIN [     ]-- an increase of over $ [             ] from its original proposal.  Compare AR at 149 with AR at 194-95.

In its revised proposals for Regions 5, 6A and 6B, AshBritt raised its prices on all nine of the CLINs that the agency identified as low in comparison with the IGE.  The differences in AshBritt's pricing for these nine CLINs between its original and revised proposals were as follows:

**AshBritt's Initial And Revised Offers On Nine "Low" CLINs, By Region**

|  | Region 5 | | Region 6A | | Region 6B | |
|---|---|---|---|---|---|---|
|  | Initial | Revised | Initial | Revised | Initial | Revised |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |

AR at 149-52, 154-57, 159-62, 195-98, 200-03, 205-08.

By comparison, ECC's and Ceres' bids on these same nine CLINs were as follows:

**ECC's Initial And Revised Offers On Nine CLINs, By Region**

|  | Region 5 | | Region 6A | | Region 6B | |
|---|---|---|---|---|---|---|
|  | Initial | Revised | Initial | Revised | Initial | Revised |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |
| [    ] | [    ] | [    ] | [    ] | [    ] | [    ] | [    ] |

| [    ] | [       ] | [        ] | [       ] | [      ] | [      ] | [      ] |
|---|---|---|---|---|---|---|
| [    ] | [       ] | [        ] | [      ] | [     ] | [     ] | [     ] |
| [    ] | [       ] | [       ] | [      ] | [     ] | [     ] | [     ] |
| [    ] | [       ] | [      ] | [      ] | [     ] | [     ] | [     ] |

AR at 1014-16, 1018-20, 1023-25, 1027-29.

**Ceres' Initial And Revised Offers On Nine CLINs, By Region**

|  | Region 5 | | Region 6A | | Region 6B | |
|---|---|---|---|---|---|---|
|  | **Initial** | **Revised** | **Initial** | **Revised** | **Initial** | **Revised** |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ][16] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| [    ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |

AR at 938-44, 950-56, 962-68.

AshBritt's revised proposal also amended its subcontracting plan by providing two lists of subcontractors.  AR at 1453-69.  The first list, entitled "Stand-by First Responder Subcontractors,"

_____

[16] Ceres' initial Schedule B forms submitted for Regions 6A and 6B left CLIN **[    ]** blank. AR at 955, 967.

15

stated, "[t]he following subcontractors have long positive working relationships with AshBritt, Inc. [and] are geared to mobilize upon our notification. This is only a partial list of our available subs." AR at 1453-55. This first list included three pages of subcontractors, listed alphabetically by name along with the corresponding addresses and telephone numbers for each subcontractor. Id. A second, 14-page list stated, "AshBritt, Inc. has over 12,000 registered subcontractors nationwide. The following list represents a random sample of these." AR at 1456-69. This second list provided addresses and telephone numbers for each subcontractor and also included a matrix of "Reported Equipment Quantities" for each subcontractor. Id. This matrix listed 19 types of equipment, such as "DmpTrks" and "Excav," and the quantity of each type of equipment to which the individual subcontractor had access. Id. Neither list included information about the small business designation of the listed subcontractors or what type of work each subcontractor would perform. However, AshBritt's subcontracting plan included a list of the various small business categories and the type of work which each category might perform. AR at 1439.

AshBritt's revised subcontracting plan also included new sections entitled "Small Business Participation Challenges: Past & Present" and "Small Business Goal Achievement," which discussed AshBritt's past experiences with subcontractors during Hurricane Katrina debris removal operations and stated that AshBritt had exceeded the small business utilization goal of **[   ]**% on its Katrina contract with an **[   ]**% utilization mark. AR at 1449-51. AshBritt also included a Standard Form 295 Summary Subcontract Report which listed AshBritt's past performance in meeting utilization rates for special small business designations: **[   ]**% small disadvantaged business, **[   ]**% women-owned small business, **[ ]**% HubZone, **[ ]**% veteran-owned small business, and **[ ]**% HBCU/MI. AR at 1452.

## The SSEB's Final Evaluation Report

On January 4, 2008, the SSEB issued a Final Evaluation Report. AR at 491-99. On their subcontracting plans, AshBritt and Ceres both received consensus ratings of "**[     ]**" -- **[                                       ]**. AR at 494. The subcontracting plans for ECC, Phillips & Jordan, and Crowder Gulf were each given the highest rating of "Outstanding." Id. Regarding the ADMS pricing, the Contracting Officer stated in the Final Evaluation Report that "[t]he new price methodology for ADMS has improved the offers significantly." AR at 499.

## The Agency's Initial Selection Decision

On January 24, 2008, the Source Selection Authority ("SSA") selected primary contracts and reach back assignments as follows:

16

| Region | Primary Contract | Reach Back Assignment |
|---|---|---|
| 1 | ECC | Phillips & Jordan |
| 2A | Phillips & Jordan | Ceres |
| 2B | Crowder Gulf | Ceres |
| 2C | Xpert's | Phillips & Jordan |
| 2D | BGM-Ceres | N/A |
| 3 | ECC | Crowder Gulf |
| 4 | Ceres | Phillips & Jordan |
| 5 | ECC | Phillips & Jordan |
| 6A | ECC | Phillips & Jordan |
| 6B | Ceres | Phillips & Jordan |

AR at 521. The agency informed AshBritt that it had not been selected for any primary or reach back award by letter dated January 25, 2008. AR at 522-23. AshBritt requested a pre-award debriefing, which the agency provided on January 29, 2008. AR at 548.

On February 4, 2008, AshBritt filed a bid protest with the GAO, docketed as number B-310442-2. AR at 524-47. However, in a February 14, 2008 memorandum, Contracting Officer [          ] determined that corrective action was appropriate, stating that the SSEB "made errors in the evaluation of the offers." AR at 548. Specifically, the Contracting Officer advised GAO that the agency "had erroneously failed to include all option years in its price evaluation," even though the solicitation included FAR 52.217-5, Evaluation Of Options. AR at 48.[17] Because the problem was the failure to evaluate in accordance with the terms of the solicitation, the agency did not allow offerors to submit new proposals, but rather conducted a re-evaluation of price based upon the revised proposals which had been submitted on September 10, 2007. See, e.g., AR at 581-88, 606-26.

On March 5, 2008, in light of the agency's determination to undertake corrective action, the GAO dismissed AshBritt's protest as academic. AR at 550. The agency notified all offerors on March 6, 2008, that it would rescind the selection decision and conduct a new evaluation. AR at 551-58.

**The Agency's Second Evaluation**

As part of its corrective action, the agency conducted a complete re-evaluation of price in March of 2008. On March 10, 2008, the DCAA, in response to a request from the Contracting Officer, issued a memorandum detailing the results of a second on-site review of the agency's revised price analysis of proposals which now included option years. AR at 559-61. The DCAA found that the agency's pricing model "provided sufficient details needed for a comparative analysis between the bidders and the IGE at the summary level and by [CLINs]" and "appears to provide sufficient data for selection purely on the basis of pricing." AR at 559-60. However, the DCAA

---

[17] This error was not directly related to any issues asserted by AshBritt in its protest.

further found "potential problem areas" with regard to CLINs [     ], [     ], [     ], [     ], [     ], and [     ].  AR at 560.  For each of these CLINs, the DCAA identified discrepancies between the IGE and the offerors' bids.  Id.

The DCAA stated that "the price analysis process can be enhanced by further review and analysis of the requirement for the ADMS and the IGE," and that "additional effort is needed to determine why there is such a significant range in the bid estimates for CLINs [     ] and [     ] [the ADMS CLINs] and the IGE."  Id.

On March 21, 2008, the agency produced a revised IGE.  AR at 783-87.  The revised IGE determined the total price of the now sub-divided CLIN [     ] to be $[     ] -- up from $[     ] in the original IGE.  Compare AR at 392 with AR at 787.  The revised IGE also decreased the price for CLIN [     ] from $[     ] to $[     ] and the price for CLIN [     ] from $[     ] to $[     ].  Compare AR at 394-95 with AR at 785-86.

The agency did not advise the offerors of the revision to the IGE, nor did it allow the offerors to submit new prices using the revised IGE as a benchmark.  Rather, the prices submitted in the offerors' revised proposals on September 10, 2007, continued to comprise the basis for the agency's price evaluation.

On March 21, 2008, the Contracting Officer prepared a revised Initial Evaluation Report.  AR at 562-73.  Substantial portions of this revised report repeated verbatim the text of the original Initial Evaluation Report issued on August 20, 2007, including the Contracting Officer's overall conclusion that "[d]iscussions are needed to improve understanding of the ADMS requirements . . . ."  Compare AR at 562-73 with AR at 379-90.  However, this language was a mistaken carry-over from the original Initial Evaluation Report, and the referenced discussions on ADMS pricing had already taken place during the competitive range discussions on August 31, 2007.  See Amended [     ] Decl. (May 6, 2009) at ¶¶ 6-8.[18]

**The Contracting Officer's Price Negotiation Memorandum**

On March 26, 2008, the Contracting Officer issued a price negotiation memorandum addressing the agency's price discussions, the revisions to the agency's ADMS pricing breakdown, and the changes made to the IGE for some CLINs.  AR at 576-88.  In this memorandum, the Contracting Officer also summarized the discussions on individual CLINs with various offerors -- in some instances stating that specific CLINs had been discussed with individual offerors despite the lack of such an indication in either the discussion agendas or the post-discussion written summary.

---

[18]  In a file memorandum dated March 21, 2008, the Contracting Officer indicated that the prices in the revised Initial Evaluation Report differed from those in the original report in that they incorporated the revised ADMS pricing and included all option years (rather than simply the base year).  AR at 590.

AR at 578.[19]  Referencing "pricing spreadsheets" dated August 6, 2007, which are not in the AR, the
Contracting Officer stated that "the following items . . . were discussed" during the August 31, 2007
discussions -- which had been held some seven months earlier with offerors:



- "[                                              ] were too high in
comparison to the IGE."

- "[                                              ] Proposed prices
were unreasonable."

- "[
                                              ] were too low in
comparison to the IGE."

- "[                              ] were too high in comparison
to the IGE."

- "[
                              ] were too high in comparison to the IGE."

- "[                                              ] were too high in
comparison to the IGE."

- "[                                                      ]
was too low in comparison to the IGE."

- "[
                                      ] were high in comparison to the IGE."

- "[
                              ] were high in comparison to the IGE."

- "[
                              ] were high in comparison to the IGE."

- "[                                              ] were
low in comparison to the IGE."

AR at 578.  The price negotiation memorandum differed from the discussion agendas in that it stated

---

[19]  The Contracting Officer did not address this in his declaration submitted to supplement
the AR.

that CLINs [        ] were identified to [                  ], and [        ] as low in comparison to the IGE, while the discussion agendas did not mention that CLINs [                ] were discussed with these offerors.  Compare AR at 466, 469, 475 with AR at 578.  While the price negotiation memorandum also stated that "all offerors" were advised that their prices on CLIN [      ] were low in comparison to the IGE, the discussion agendas did not state that [                        ], or [                      ] received such advice.  Compare AR at 463, 466, 469, 475 with AR at 578.[20]

In the price negotiation memorandum, the Contracting Officer concluded:

> The IGE for all Section B items excluding the ADMS line items was
> $[                ].  All revised proposals in the competitive range
> compared favorably to this estimate.  As demonstrated through
> competition, ADMS pricing methodology has been improved and the
> proposed prices can be determined fair and reasonable through
> competition. Considering these two facts, the Contracting Officer has
> determined that the overall prices offered by all companies in the
> Competitive Range for this solicitation are fair and reasonable.

AR at 588.

## The SSEB's Final Evaluation Report

On March 26, 2008, the SSEB issued a revised Final Evaluation Report which set forth the results of the agency's technical evaluations, coupled with the offerors' prices.  AR at 591-600.  The Final Evaluation Report concluded:

> The revised proposals received in response to this solicitation were
> extremely competitive.  All Sample Task Order prices appear to be
> realistic and within an acceptable range.  Many of the weaknesses in

---

[20] The Court gives greater weight to the contemporaneous reflection of the price discussions in the discussion agendas and the post-discussion written summary than to the post hoc price negotiation memorandum.  The price negotiation memorandum was prepared almost seven months after discussions took place, and it is unclear upon what records the Contracting Officer relied in preparing the price negotiation memorandum.  As the Court recognized in Passamaquoddy Tribe v. United States, 82 Fed. Cl. 256, 272 (2008) (citing Curucas v. Sec'y of Dep't of Health and Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993)), "[t]o the extent that there is a conflict in [the] evidentiary record, the court must give more weight to contemporaneous documentary evidence."  See also Anderson v. Sullivan, 925 F.2d 220, 222 (6th Cir. 1991) ("The Secretary was entitled to give more weight to this contemporaneous medical evidence than to medical opinions based on six or seven years of hindsight."); Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 405-06 (2004) (stating that "recorded remarks and early correspondence [of officer of plaintiff corporation] . . . were much more credible in the Court's view than later evidence attributed to him").

the original proposals have been eliminated and the value of the
offers has increased.  The new price methodology for ADMS has
improved the offers significantly.

AR at 600.

**The SSA's Final Source Selection Decision**

The agency issued its final source selection decision on April 8, 2008.  AR at 606-26.  The
SSA awarded primary contracts and reach back assignments as follows:

| Region | Primary Contract | Reach Back Assignment |
|--------|------------------|------------------------|
| 1 | ECC | Phillips & Jordan |
| 2A | Phillips & Jordan | Ceres |
| 2B | AshBritt | Ceres |
| 2C | Xpert's | Phillips & Jordan |
| 2D | BGM-Ceres | N/A |
| 3 | ECC | AshBritt |
| 4 | Ceres | Phillips & Jordan |
| 5 | ECC | Phillips & Jordan |
| 6A | ECC | Phillips & Jordan |
| 6B | Ceres | Phillips & Jordan |

AR at 626.  As the table notes, AshBritt received the primary contract for Region 2B and the reach
back contract for Region 3.  Id.  AshBritt now challenges the selection of primary contracts for
Regions 5, 6A, and 6B.

**Region 5**

In Region 5, ECC, Phillips & Jordan, Crowder Gulf, AshBritt, and Ceres submitted offers.
AR at 620-21.  The agency evaluated Past Performance according to a color coding system.  AR at
675.  "Blue" was the highest rating possible, representing "Low Risk," while "Green" was the
second highest rating, representing "Moderate Risk."  Id.

The agency evaluated the Management/Operations Plan and the Sample Task Order
according to a separate color coding system in which "Blue" -- the highest score -- was designated
"Outstanding" and "Green -- the second highest score -- was designated "Good."  AR at 677, 684.
For the Proposal Risk category, the agency assigned one of three adjectival ratings: Low, Moderate,
or High.  AR at 687.

Because Ceres received an award in Region 4, it was deemed ineligible for adjacent Region
5.  AR at 620.  The proposals of the remaining offerors were rated as follows:

21

**Region 5 (CA, NV, UT, AZ, NM) - Technical Evaluation And Price**

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk | Price |
|---|---|---|---|---|---|---|
| **ECC** | [      ] | [          ] | [        ] | [        ] | [      ] | [          ] |
| **Phillips & Jordan** | [      ] | [          ] | [        ] | [        ] | [      ] | [          ] |
| **Crowder Gulf** | [      ] | [          ] | [        ] | [        ] | [      ] | [          ] |
| **AshBritt** | [      ] | [          ] | [        ] | [        ] | [      ] | [          ] |

Id. AshBritt was the **[      ]** priced offeror in Region 5. ECC, who received the Region 5 primary contract, was the lowest priced offeror with the highest non-cost ratings. Phillips & Jordan was the second lowest priced offeror, with identical non-cost ratings to ECC. Because AshBritt and Crowder Gulf were higher in cost and lower in non-cost ratings, they were not considered for award. Id. The Source Selection Authority found no meaningful distinction between the non-cost portions of ECC's and Phillips & Jordan's proposals, and awarded the contract to the lowest bidder, ECC. AR at 621.

**Region 6B**

The proposals for Region 6B -- the Alaska region -- were rated as follows:

**Region 6B (AK) - Technical Evaluation And Price**

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk | Price |
|---|---|---|---|---|---|---|
| **Phillips & Jordan** | [      ] | [          ] | [        ] | [        ] | [      ] | [          ] |
| **AshBritt** | [      ] | [          ] | [        ] | [        ] | [      ] | [          ] |
| **Ceres** | [      ] | [          ] | [        ] | [        ] | [      ] | [          ] |

AR at 621. Once again, AshBritt was the **[      ]** priced offeror. Ceres submitted the lowest offer, but Phillips & Jordan had the highest non-cost ratings. The Source Selection Authority determined that the technical benefits of Phillips & Jordan's proposal did not outweigh the cost savings of Ceres' offer. AR at 622. Citing Ceres' past performance of a demolition contract in Greenland under similar climate changes, the Source Selection Authority found Ceres' offer to be uniquely suited to the Alaska region. Id. This fact, coupled with the lower price, increased the overall value of Ceres' offer in the eyes of the Source Selection Authority, who awarded Region 6B to Ceres, even though

it had received a lower rating on its subcontracting plan than Phillips & Jordan.  Id.

## Region 6A

Because Ceres received the Region 6B award within the same division, it was deemed ineligible for Region 6A, Hawaii.  Id.  The proposals of the remaining offerors were rated as follows:

## Region 6A (HI) - Technical Evaluation And Price

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk | Price |
|---|---|---|---|---|---|---|
| ECC | [      ] | [      ] | [      ] | [      ] | [      ] | [      ] |
| Phillips & Jordan | [      ] | [      ] | [      ] | [      ] | [      ] | [      ] |
| AshBritt | [      ] | [      ] | [      ] | [      ] | [      ] | [      ] |

AR at 621.  Again, AshBritt submitted the **[      ]** bid in the region.  ECC was the lowest priced offeror, and Phillips & Jordan was the second lowest.  Finding no meaningful distinction between the non-cost portions of ECC's and Phillips & Jordan's proposals, the Source Selection Authority awarded the primary contract for Region 6A to the lowest offeror, ECC.  AR at 622-23.

## Reach Back Assignments

AshBritt challenges the reach back selections for Regions 2C, 4, 5, 6A, and 6B.[21]  The source selection decision stated that, "[i]t is the intent of the Government to select a contractor for a reach back assignment based on receiving the highest non-cost ratings in that region.  The Government never intended to complete a trade off analysis for a reach back assignment."  AR at 623.  As such, the Source Selection Authority assigned reach back contracts for each region based solely upon non-cost ratings and the geographic limitations on multiple awards described in the solicitation.  AR at 623-25.  The source selection decision also included a "decision tree" for "selecting the reach back contractors for each region."  AR at 609-10.

In the contested regions for reach back awards, the non-cost factors for each of the eligible offerors were rated as follows:

---

[21]  Phillips & Jordan, the offeror selected for all of these reach back assignments, did not intervene in this action.

## Region 2C Reach Back Evaluation

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk |
|---|---|---|---|---|---|
| Phillips-Vieques | [    ] | [    ] | [    ] | [    ] | [    ] |
| AshBritt | [    ] | [    ] | [    ] | [    ] | [    ] |
| Ceres Caribe | [    ] | [    ] | [    ] | [    ] | [    ] |

## Region 4 Reach Back Evaluation

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk |
|---|---|---|---|---|---|
| Phillips & Jordan | [    ] | [    ] | [    ] | [    ] | [    ] |
| AshBritt | [    ] | [    ] | [    ] | [    ] | [    ] |
| Crowder Gulf | [    ] | [    ] | [    ] | [    ] | [    ] |

## Region 5 Reach Back Evaluation

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk |
|---|---|---|---|---|---|
| Phillips & Jordan | [    ] | [    ] | [    ] | [    ] | [    ] |
| Crowder Gulf | [    ] | [    ] | [    ] | [    ] | [    ] |
| AshBritt | [    ] | [    ] | [    ] | [    ] | [    ] |
| Ceres | [    ] | [    ] | [    ] | [    ] | [    ] |

## Region 6A Reach Back Evaluation

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk |
|---|---|---|---|---|---|
| Phillips & Jordan | [    ] | [    ] | [    ] | [    ] | [    ] |
| AshBritt | [    ] | [    ] | [    ] | [    ] | [    ] |
| Ceres | [    ] | [    ] | [    ] | [    ] | [    ] |

24

## Region 6B Reach Back Evaluation

|  | Past Performance | Management/ Operations Plan | Subcontracting Plan | Sample Task Order | Proposal Risk |
|---|---|---|---|---|---|
| **Phillips & Jordan** | [        ] | [        ] | [        ] | [        ] | [        ] |
| **AshBritt** | [        ] | [        ] | [        ] | [        ] | [        ] |

AR at 623-25.

Phillips & Jordan received the reach back assignments in Regions 2C, 4, 5, 6A, and 6B -- the reach back regions at issue in this protest.  In Region 2C, AshBritt's bid was $ [ 

] that of Phillips & Jordan.  See AR at 598.  In Region 4, the price difference between AshBritt and Phillips & Jordan was $[            ].  See AR at 599.  In Region 5, AshBritt bid $[            ] more than Phillips & Jordan.  See id.  In Regions 6A and 6B, AshBritt's bid was $[            ] higher than that of Phillips & Jordan.  See id.

## AFARS Appendix DD Scoring Of The Subcontracting Plans[22]

In its technical evaluation, the SSEB rated the subcontracting plans for AshBritt and Ceres as "[      ]" and the subcontracting plans for ECC, Phillips & Jordan, and Crowder Gulf as "Outstanding."  AR at 594.  The Source Selection Decision Document stated the following reasons for the lower score on AshBritt's subcontracting plan:

> The weakness in [AshBritt's] plan was that it did not identify the contribution of the extensive list of subcontractors to a debris mission.  Further, it lost points in the evaluation for not addressing efforts to involve HBCUs and MI in performing the contract and for [identifying] and overcoming obstacles that may prohibit award to these institutions.

AR at 616.

AshBritt's small business subcontracting plan received a score of **[            ]** on the AFARS Appendix DD checklist.  AR at 1198.  This score was unchanged from the score of **[  ]** that AshBritt received on its initial proposal.  Compare AR at 1188 with AR at 1198.  In response to discussions, AshBritt added a lengthy list of subcontractors detailing key personnel and equipment

---

[22] The AFARS Appendix DD scoring, as part of the technical evaluation, was conducted during the agency's first evaluation of proposals.  Following the GAO protest, the agency only re-evaluated pricing, not this Appendix DD scoring.

quantities and added two new sections to its proposal to address historic small business participation, goals and achievement. AR at 1449-69.  AshBritt's score in all seven categories on the AFARS Appendix DD checklist was unchanged from its initial to its revised proposal.  Compare AR at 1188 with AR at 1198.

In contrast, the agency raised Phillips & Jordan's Appendix DD score from [  ] points on its initial proposal to [  ] points on its revised proposal -- an increase of [ ] points.  Compare AR at 1169 with AR at 1201.  The agency raised ECC's Appendix DD score from [  ] points to [  ] points on its revised proposal -- an increase of [  ] points.  Compare AR at 1175 with AR at 1204.

During discussions, the agency had advised ECC and Phillips & Jordan that they had failed to adequately address HBCU/MI utilization in their initial proposals.  AR at 463, 469.  In evaluating the revised proposals, the agency indicated ECC's "[i]ncrease[d] goals for HBCU/MI w/ commitment to include subcontracting services w/ identification of colleges + MI contacted" was a strength of its revised subcontracting plan.  AR at 1203.  Likewise, the agency indicated as a strength of Phillips & Jordan's revised proposal its "outstanding sub plan to include SB's + HBCU/MI's."  AR at 1200.

The agency did not mention HBCU/MI utilization to AshBritt during discussions.  See AR at 460, 480.  According to the final source selection decision, AshBritt "lost points" on its revised proposal for "not addressing efforts to involve HBCUs and MI" in its subcontracting plan.  AR at 616.

On its initial proposal, AshBritt received a score of [  ] in the past performance category -- which asked offerors to detail the "[e]xtent to which the company has historically been successful in establishing realistic, yet challenging, [small business] goals and achieving them."  AR at 1188. In response to the agency's notification during discussions that "[s]mall business goal achievement was not discussed in [AshBritt's initial] proposal," AshBritt's revised proposal included sections entitled "Small Business Participation Challenges: Past & Present" and "Small Business Goal Achievement," which discussed AshBritt's past experiences with subcontractors during Hurricane Katrina debris removal operations and pointed out that AshBritt had exceeded the small business utilization goal of [  ]% on its Katrina contract with an  [  ]% utilization mark.  AR at 459, 1449-51. AshBritt also included a Standard Form 295 Summary Subcontract Report that detailed the overall [    ]% small business utilization mark on AshBritt's previous debris removal contract with the agency, as well as the utilization rates for special small business designations:  [  ]% small disadvantaged business, [ ]% women-owned small business, [ ]% HubZone, [ ]% veteran-owned small business, and  [ ]% HBCU/MI.  AR at 1452.  AshBritt received no increase in score in the past performance category from the [  ] received on its original proposal.  Compare AR at 1188 with AR at 1198.

**Sufficiency Of Detail In Subcontracting Plans**

In their evaluation worksheets for AshBritt's revised proposal, SSEB members indicated the following weaknesses in AshBritt's subcontracting plan: "Subcontractors not identified in sufficient detail" and "Revised proposal does not detail how local subs will be utilized." AR at 1197, 1211. The consensus SSEB evaluation identified a weakness in AshBritt's subcontracting plan -- that the "[r]evised proposal includes additional subcontractors, but failed to identify their contribution." AR at 1217.

In his Statement of Relevant Facts to the GAO regarding AshBritt's bid protest, the Contracting Officer elaborated on the scoring of AshBritt's subcontracting plan, stating:

> During discussions, the agency told AshBritt that subcontractors were not identified in sufficient detail in the plan. In the final proposal revision, AshBritt included a very long list of subcontractors. This lengthy list appeared to be a "dump" from a database of small businesses. The list failed to specify the type of work these subcontractors could perform. The SSEB could not confirm that these small businesses would be able to contribute to the debris mission. This weakness was a primary consideration in the SSEB's decision to rate the Small Business Subcontracting Plan as "Good."

AR at 58 (citations omitted).

Crowder Gulf's subcontracting plan, which was given the highest rating of "Outstanding," provided a list of subcontractors which included only the following information for each subcontractor: name, contact person, address, city, state, zip code, and county. AR at 1485-1529. Crowder Gulf's list, unlike AshBritt's, was broken down by region. See, e.g., AR at 1485, 1489. Crowder Gulf's list did not include any information as to the type or quantity of equipment each subcontractor could utilize. AR at 1485-1529. A coversheet for each region indicated the total number of subcontractors for that region and the number of subcontractors within that region who identified themselves as small business, women-owned, veteran-owned, service-disabled veteran-owned, HubZone, or small disadvantaged. See, e.g., AR at 1485, 1489. The list did not identify which individual contractors satisfied which of these small business subcontracting goals, nor did the list identify what type of work each subcontractor would perform. See AR at 1485-1529. However, a matrix included in Crowder Gulf's subcontracting plan listed the types of work that Crowder Gulf expected to assign to each category of small business subcontractors. AR at 1474.[23] Neither this matrix nor the regional subcontractor lists specified what type of work individual subcontractors would do.

---

[23]   Crowder Gulf's matrix listed categories of work, and for each of these categories, indicated which categories of small business subcontractors -- e.g., veteran-owned small businesses or small disadvantaged businesses -- Crowder Gulf expected to perform such work. AR at 1474.

In its evaluation worksheets, the agency listed the following strengths and weaknesses in Crowder Gulf's subcontracting plan:

> Strengths: Commitment to using local firms from impacted areas. (Page 1 of 10) Assumed the Government's goals and pledges to attempt to exceed them.  (Page 7 of 10) List of subs and letter of commitment included for all offered regions.   Lists includes resources.
>
> Weaknesses: N/A

AR at 1218.

In contrast, the subcontractor list submitted by ECC included [

] -- for example, civil construction, fencing, environmental services, or hauling/trucking.   AR at 1405-08.   Likewise, Phillips & Jordan's subcontractor list provided [

].  AR at 1427-29.  Both ECC and Phillips & Jordan received "Outstanding" scores on their subcontracting plans.  AR at 1213, 1219.


## Discussion

### Standard Of Review

In a bid protest, the court reviews the defendant's decision under the standards in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4).  A reviewing court shall overturn an agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

In order to meet this standard, the protestor must show by a preponderance of the evidence that "'either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  A court evaluating a challenge on the first ground must determine "'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  Id.  "'When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'"  Id.

In resolving bid protests, the trial court is to make findings of fact weighing the evidence in the administrative record.  See Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005).

If the plaintiff succeeds in demonstrating an error in the procurement process, the Court then proceeds to determine, as a factual matter, if the protestor was prejudiced by that error.  Id. at 1351; see also Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (holding that to prevail in the protest, the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it); Gentex Corp. v. United States, 58 Fed. Cl. 634, 648 (2003).

To obtain a permanent injunction, a party must show that:  (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest.  See Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000); see also Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000), aff'd, 10 F. App'x 957 (Fed. Cir. 2001).

**The Instant Protest**

AshBritt restricts its protest to the primary awards in Regions 5, 6A, and 6B, and the reach back assignments in Regions 2C, 4, 5, 6A, and 6B.[24]  In each of these regions, AshBritt was an actual offeror with a direct economic interest in receiving award.  AshBritt lodges six grounds of protest.  First, AshBritt argues that the agency's evaluation of subcontracting plans was arbitrary and capricious.  Second, AshBritt argues that the agency engaged in unequal and misleading discussions regarding pricing and claims that these discussions induced AshBritt but not its competitors, to propose higher prices.  Third, AshBritt submits that the agency relied on a flawed IGE during price discussions and revised the IGE without advising offerors, or reopening discussions.  Fourth, AshBritt contends that the agency conducted inadequate discussions regarding the ADMS system to be employed during debris removal.  Fifth, AshBritt argues that the agency departed from the terms of the solicitation by failing to evaluate price in its selection of reach back assignments.  Finally, AshBritt contends that the agency disregarded the evaluation criteria in the solicitation by failing to require offerors to burden their prices.

**Supplementation Of The AR**

Defendant seeks leave to supplement the AR with the declaration of Contracting Officer [                    ] for the purpose of correcting a mistake in the revised Initial Evaluation Report and addressing the permissibility of accepting unburdened pricing, AshBritt's alleged prejudice, and the propriety of awarding injunctive relief.  AR at 573, 716.

---

[24]  Because AshBritt already holds the primary contract in Region 2B and the reach back assignment for Region 3, the solicitation's adjacency limitations preclude AshBritt from receiving the primary contracts for Regions 2A and 2C.  The adjacency limitation also prohibits AshBritt from receiving the primary or reach back contracts for Region 1.  Because AshBritt received the reach back contract for Region 3, it cannot receive the primary contract in the same region.  Finally, because AshBritt did not submit an offer for Region 2D, it cannot receive the reach back assignment in that region.

29

As the Federal Circuit recently recognized in <u>Axiom</u>, when the trial court in a bid protest is reviewing an agency's procurement decision, "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" 564 F.3d at 1379 (quoting <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973)).  Indeed, because the trial court is to apply the standard of review in the Administrative Procedure Act to the agency decision based on the record the agency presents to the reviewing court, "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" <u>Id.</u> at 1380 (quoting <u>Murakami v. United States</u>, 46 Fed. Cl. 731, 735 (2000), <u>aff'd</u>, 398 F.3d 1342 (Fed. Cir. 2005)).

Here, extra-record material is necessary to allow effective review of AshBritt's claim that discussions regarding ADMS were not held.  As explained in paragraphs 5-8 and 12-13 of the Contracting Officer's amended declaration, there were clerical errors in the Initial Evaluation Report and spreadsheet notes which mistakenly referenced the need for reopening discussions when these discussions had already occurred.  Amended [     ]Decl. (May 6, 2009) at ¶¶ 5-8, 12-13; <u>see</u> AR at 573, 716.  As such, standing uncorrected, the AR is erroneous and misleading.  Allowing a protest to be decided upon an AR which does not reflect what actually transpired would perpetuate error and impede and frustrate effective judicial review.  <u>See Axiom</u>, 564 F.3d at 1381; <u>see also</u> <u>Saratoga Dev. Corp. v. United States</u>, 21 F.3d 445, 457-58 (D.C. Cir. 1994).[25]  Therefore, the Court grants Defendant's leave to supplement the AR with paragraphs 5-8 and 12-13 of the Amended [     ] Declaration.

Defendant also seeks to supplement the AR with testimony of Contracting Officer [     ] to provide his assessment of whether offerors could offer unburdened pricing.  However, resolution of whether the solicitation prohibited the agency from accepting unburdened pricing does not require testimony from the Contracting Officer.  This is purely a legal issue.  As explained below, in a fixed-price procurement, the agency is not required to reject unburdened bids outright because the risk of lowball pricing is on the contractor.  If a contractor elects to bid unburdened rates, that would not disqualify the proposal, it would simply set a ceiling on what the contractor could be paid under any resultant contract.

Defendant contends that supplementation of the AR is necessary for this Court to review AshBritt's claims of prejudice and its entitlement to injunctive relief.  Defendant seeks to supplement the AR with the Contracting Officer's testimony to refute AshBritt's claims that it suffered prejudice as a result of unequal and misleading price discussions and the improper

---

[25]  In <u>Axiom</u>, the Federal Circuit cited <u>Saratoga</u> as an example of a D.C. Circuit decision which demonstrated a more restrictive approach to accepting extra-record evidence than <u>Esch v. Yeutter</u>, 876 F.2d 976 (D.C. Cir. 1989) -- calling into question the continued viability of <u>Esch</u> even in the D.C. Circuit.  <u>Axiom</u>, 564 F.3d at 1380-81.  As the Federal Circuit in <u>Axiom</u> noted, <u>Saratoga</u> explained that "additional administrative discovery is permissible only if necessary 'for effective judicial review' or if the existing 'record cannot be trusted.'" <u>Axiom</u>, 564 F.3d at 1380.  Here, absent supplementation on the issue of ADMS discussions, the existing record cannot be trusted.

evaluation of its small business subcontracting plan.  In general, it is appropriate to add evidence pertaining to prejudice and the factors governing injunctive relief to the record in a bid protest -- not as a supplement to the AR, but as part of this Court's record.  Evidence directed at prejudice and remedy necessarily would not be before an agency decisionmaker effecting a procurement decision such as a source selection award.  Rather, evidence of the prejudicial effect <u>vel non</u> of a procurement decision or the ramifications of injunctive relief would necessarily post date and flow from such agency decision.  Nonetheless, such evidence is crucial to assess whether relief is warranted.  As Judge Lettow recently explained in <u>Holloway & Company v. United States</u>, No. 09-53C, slip op. at 12-13 n.12 (Fed. Cl. May 14, 2009):

> In a protest before the court, factual matters respecting relief rest on a separate and distinct footing.  "It is the responsibility of this [c]ourt, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief."  <u>PGBA, LLC v. United States</u>, 60 Fed. Cl. 567, 568 n.1 (2004), <u>aff'd</u>, 389 F.3d 1219 (Fed. Cir. 2004).  <u>See also Bannum</u>, 404 F.3d at 1354 ("28 U.S.C. § 1491(b)(4) applies to the Court of Federal Claims's review of agency findings, not the trial court's initial fact-finding. . . . [The] 'arbitrary and capricious' review . . . standard goes to the agency's compliance with the law, whereas the prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award."); RCFC 52.1 Rules Committee Note for 2006 Adoption ("Cases filed in this court frequently turn only in part on action taken by an administrative agency.  In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements may be derived from a trial [or] . . . an evidentiary hearing.").

Following <u>Holloway</u>, this Court admits those portions of the Amended **[      ]** Declaration addressing prejudice and injunctive relief.

## The Agency's Evaluation Of Subcontracting Plans

AshBritt challenges the evaluation of subcontracting plans in three respects -- claiming that the agency 1) did not score subcontracting plans equally, 2) conducted unequal and misleading discussions, and 3) failed to credit AshBritt's revisions to its proposal which addressed past performance in meeting subcontracting goals.

**The Agency's Evaluation Of Subcontractors In AshBritt's And Crowder Gulf's Subcontracting Plans**

AshBritt first argues that the agency's scoring of the subcontracting plans was unequal and inconsistent because AshBritt received a "Good" rating and Crowder Gulf an "Outstanding" rating when any differences between their plans' description of potential subcontractors were negligible.

This Court does not sit as a super source selection authority to second guess and re-score offerors' proposals. Rather, it is well established that the Court should not substitute its judgment to assess the relative merits of competing proposals in a government procurement. See, e.g., R & W Flammann GMBH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir. 1995)). That said, where an evaluation scores two virtually identical proposals differently, such an inconsistent evaluation is quintessentially arbitrary, capricious and unfair. Here, although AshBritt and Crowder Gulf both missed the mark in describing what their small business subcontractors would do, AshBritt was penalized, but Crowder Gulf was not.

While AshBritt's plan failed to indicate the small business designation or type of work to be performed by each individual subcontractor, Crowder Gulf's plan was deficient in this same regard, providing only a name and location for each subcontractor. Although Crowder Gulf's plan included a matrix which coupled small business categories with the type of work that subcontractors in each category would perform, this matrix provided no details as to the contribution of each individual subcontractor. Thus, Crowder Gulf's proposal suffered from the same deficiency as AshBritt's plan, but received an "Outstanding" rating, while AshBritt's subcontracting plan was rated "Good."

Nonetheless, differing treatment in this context does not establish a prejudicial procurement error entitling AshBritt to relief. If AshBritt has demonstrated an error in the agency's evaluation of the subcontracting plans, it is that the agency incorrectly scored Crowder Gulf too high, not that it scored AshBritt too low. However, the apparent overly generous evaluation of Crowder Gulf's proposal is of no moment here. Because Crowder Gulf did not receive a primary or reach back award, it did not benefit from this error, and AshBritt suffered no prejudice as a result. In contrast, the two offerors who did receive higher ratings -- ECC and Phillips & Jordan -- had more detailed, responsive proposals than either AshBritt or Crowder Gulf, and AshBritt does not challenge their ratings. [

]. AR at 1405-08, 1427-29. AshBritt has not demonstrated that its proposed subcontractor designations were comparable to those of ECC or Phillips & Jordan.

**The Agency Conducted Unequal Discussions With Regard To HBCU/MI Goals**

AshBritt correctly argues that the agency's discussions regarding the need to address the HBCU/MI goals were misleading, incomplete, and unequal. During discussions, the agency did not mention to AshBritt its failure to address HBCU/MI goals in its proposal. However, the agency raised this same failing with both ECC and Phillips & Jordan. ECC's discussion agenda indicated

that ECC had failed in its original proposal to mention utilizing HBCU/MIs, and Phillips & Jordan's discussion agenda indicated that Phillips & Jordan's subcontracting plan "does not address HBCU/MI."  AR at 463, 469.  In response to these discussions, both ECC and Phillips & Jordan revised their proposals to address HBCU/MI goals, and the agency deemed these revisions to be strengths.  AR at 1200, 1203.

Importantly, the source selection decision expressly acknowledged the value of ECC's and Phillips & Jordan's HBCU/MI participation as part of its best value tradeoff determination.  The decision noted that "ECC's subcontracting plan included goals for [HBCU and MI] and specifically assigned tasks in the plan for those institutions."  AR at 612.[26]  In a similar vein, in describing Phillips & Jordan's plan, the source selection decision stated:

> Phillips and Jordan's revised proposal included significant improvements to its subcontracting plan.  It included a new subcontracting plan with commitments to utilize HBCU AND MI.  Also, the plan identifies specific areas of a debris mission that could be set-aside to the HBCU AND MIs. . . . AFARS Appx DD Checklist was utilized and the score doubled from their previous evaluation.

AR at 621.

In stark contrast, the source selection decision related that AshBritt "lost points in the evaluation for not addressing efforts to involve HBCUs and MI in performing the contract [or identifying] and overcoming obstacles that may prohibit award to these institutions."  AR at 616.[27]

---

[26]  The Court recognizes that the agency made this comment with respect to Region 1 which is not at issue here.  Nonetheless, because the technical evaluations applied across the board to all regions, ECC and Phillips & Jordan were upgraded for these HBCU/MI revisions, while AshBritt lost points in all regions in which it competed.  E.g., AR at 634.

[27]  AshBritt's Appendix DD score, which was factored into its subcontracting plan's adjectival rating of "Good," was lowered due to its failure to address HBCU/MI participation.  AR at 1217.  AFARS Appendix DD established a scoring system broken down into seven factors, each with a corresponding set of numerical point ranges.  AR at 739-43.  The total possible score on the AFARS Appendix DD checklist was 100.  AshBritt's total score on the AFARS Appendix DD checklist was [ ], unchanged between its initial and its revised proposal.  Compare AR at 1188 with AR at 1198.  In contrast, the agency raised Phillips & Jordan's AFARS score from [ ] points on its initial proposal to [ ] points on its revised proposal.  Compare AR at 1169 with AR at 1201.  The agency also raised ECC's AFARS Appendix DD score from [ ] points to [ ] points on its revised proposal.  Compare AR at 1175 with AR at 1204.  So too, Ceres -- which received no guidance during discussions regarding the need to address HBCU/MI goals -- "lost points in its AFARS [Appendix] DD evaluation for failing to indicate efforts to increase HBCU and MI participation."  AR at 615.

It is well established that an agency may not opt to discuss the identical aspect of a proposal with some offerors but not others.  See, e.g., Gentex, 58 Fed. Cl. at 652-55 (finding unequal discussions where agency discussed technical alternatives to design specifications with one offeror but not another); M&S Farms, Inc., No. B-290599, 2002 Comp. Gen. Proc. Dec. ¶ 174, 9-10 (Sept. 5, 2002) (sustaining protest where agency notified one offeror but did not notify protestor of same defect in technical proposal).  The FAR does not allow contracting officers to engage in "conduct that [f]avors one offeror over another."  FAR § 15.306(e)(1).  The record indicates that four offerors -- AshBritt, ECC, Ceres, and Phillips & Jordan -- failed to address HBCU/MI goals in their initial proposals.  While the agency advised both ECC and Phillips & Jordan of this failure during discussions, the agency did not mention this to AshBritt or Ceres.

Compounding this error, the solicitation was ambiguous regarding whether offerors were required to address a specified HBCU/MI utilization goal of "zero."  On one hand, the solicitation set the HBCU/MI utilization goal as "zero," but on the other hand, an evaluation guide referenced in the solicitation, Appendix DD, emphasized the importance of utilizing HBCU/MIs -- expressly requiring deductions in scoring when these entities were not mentioned in the subcontracting plans. AR at 739-43.[28]  The agency's discussions resolved this ambiguity for ECC and Phillips & Jordan, but not for AshBritt -- these offerors were essentially told via discussions they had better address their HBCU/MI participation in their subcontracting plans despite the solicitation's stated goal of zero, while AshBritt was not given this guidance.  This conduct is a clear and prejudicial violation of FAR § 15.306(e)'s requirement that Government personnel shall not engage in conduct that favors one offeror over another.   As this Court recognized in Gentex, an agency's discretion in holding discussions "is not a license to mislead an offeror."  58 Fed. Cl. at 653; see American K-9 Detection Services, Inc., No. B-400464.6 (May 5, 2009) at 7.

### The Administrative Record Lacks Sufficient Documentation To Support The Agency's Scoring Of AshBritt's Revised Proposal

AshBritt next contends that the agency failed to credit its revised proposal for addressing past performance in meeting subcontracting goals.  On its initial proposal, AshBritt received a score of [ ] out of a possible 10 points in the past performance category -- which asked offerors to detail the "[e]xtent to which the company has historically been successful in establishing realistic, yet

---

[28]  Section M.5 of the solicitation, listing the evaluation factors, stated that "[t]he small business subcontracting plan will be evaluated for compliance with AFARS, Appendix DD and the goals presented in Section L of the solicitation."  AR at 318.  AFARS Appendix DD is a "Subcontracting Plan Evaluation Guide" used by the Army to provide a methodology for uniform and consistent evaluation of subcontracting plans.  AR at 738.  "It is designed to facilitate compliance with the mandates of Public Law to increase opportunities for small and small disadvantaged businesses."  Id.  Although six of the seven AFARS Appendix DD factors referenced HBCU/MI goals, Section L of the solicitation established a utilization goal of "0%" for HBCU/MI.

challenging, [subcontracting] goals and achieving them." AR at 1188. During discussions, the agency advised AshBritt: "Small business goal achievement was not discussed in the proposal. No reference in proposal on problems encountered and solutions." AR at 459. In response, AshBritt included a discussion of its past experience in the Hurricane Katrina cleanup -- addressing safety and labor issues AshBritt encountered during that operation and stating that AshBritt exceeded the small business utilization goal of **[ ]**% on its Katrina contract with an **[ ]**% utilization mark. AR at 1449, 1451. Despite these additions, AshBritt's revised subcontracting plan still received a **[ ]** for the past performance category. AR at 1198.

AshBritt contends that the agency acted arbitrarily in ignoring its revisions and neglecting to alter its rating.[29] Although the agency has considerable discretion in scoring the AFARS criteria, that discretion does not go so far as to allow the agency to disregard the information provided in an offeror's revised proposal. Here, the record does not indicate whether the agency considered AshBritt's amplified information. The AR lacks any explanation for the agency's assigning AshBritt the same score of **[ ]** for past performance in meeting subcontracting goals even though AshBritt revised its proposal and detailed its past success in meeting subcontracting goals. The test for determining whether a procurement decision is rational is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa, 238 F.3d at 1333 (quoting Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). To this end, "[d]eference to the [contracting officer's] decision is contingent upon" the agency's "reasoned explanation for its decision which is in accord with material facts contained in the administrative record." Accord Nutech Laundry & Textile, Inc. v. United States, 56 Fed. Cl. 588, 593 (2003) (sustaining a protest where the agency failed to provide adequate supporting documentation regarding its preparation of the IGE and reliance on that IGE in the selection decision).

Because the agency has provided no supporting documentation to explain the scores it assigned to AshBritt, this Court cannot determine whether the agency's Appendix DD scoring of AshBritt's revised proposal took into account the amplified information on past performance and had a rational basis. As such, the Court sustains this ground of protest. See M&S Farms, Inc., No. B-290599, 2002 Comp. Gen. Proc. Dec. ¶ 174, 10 (Sept. 5, 2002) ("Where an agency fails to document or retain evaluation materials, it bears the risk that there will be inadequate supporting rationale in the record for the evaluation and source selection decision and that we will not conclude that the agency had a reasonable basis for the decision."). As the Supreme Court instructed in

_____

[29] Neither the Government nor ECC has attempted to rebut this argument. Ceres argues that the Appendix DD scoring was within the agency's discretion and characterizes AshBritt's revised proposal as providing only "blanket statement[s]" with "no specific useful information." Ceres' Br. at 11. However, Ceres overlooks the small business utilization percentages which AshBritt provided on its Standard Form 295 Summary Subcontract Report -- showing AshBritt's past performance in achieving small business subcontracting goals on a debris removal contract with the agency. AR at 1452.

Florida Power & Light Company v. Lorion, "[i]f the record before the agency does not support the agency action . . ., or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  470 U.S. 729, 744 (1985); see generally Camp v. Pitts, 411 U.S. 138, 143 (1973) (If "the determinative reason for the final [agency] action taken . . . is not sustainable on the administrative record made, then the [agency head's] decision must be vacated and the matter remanded to him for further consideration." (citing SEC v. Chenery Corp., 318 U.S. 80 (1943)).  As explained below, in light of the other errors in this procurement, the Court is remanding this procurement to the agency, directing the agency to reprocure these services in accordance with statute and regulation.  As such, the agency may revisit, and shall document, its evaluation of this aspect of AshBritt's subcontracting plan.

**Price**

AshBritt makes several allegations regarding price, claiming that the agency: 1) conducted unequal discussions regarding the pricing of numerous CLINs, 2) revised its IGE without informing offerors or reopening discussions, and 3) conducted inadequate discussions regarding the pricing of the ADMS system.

### The Agency Conducted Unequal And Misleading Pricing Discussions

During discussions, the agency informed AshBritt that its initial prices for nine CLINs -- [   ], [   ], [   ], [   ], [   ], [   ], [   ], [   ] and [   ]]-- were "low in comparison to the [IGE] ."  AR at 460.  However, although other offerors' initial prices for some of these CLINs were as low or lower than AshBritt's, the agency did not advise those offerors of this identical circumstance.[30]

For each of these nine specified CLINs, the agency advised AshBritt during discussions that its prices were "low" in comparison with the IGE, but gave no such advice to ECC or Ceres

---

[30] For CLIN [   ], Ceres' prices in Regions 5, 6A, and 6B were approximately [   ] percent lower than AshBritt.  In Region 5,  ECC and Crowder Gulf's prices were also lower than AshBritt's.  For CLIN [   ], Ceres' prices in all three regions were lower than AshBritt's, and ECC's in Region 5 was lower than AshBritt's.  For CLIN [   ], Ceres' prices in all three regions were lower than AshBritt's.  For CLIN [   ], Ceres and Phillips & Jordan offered prices up to [   ] percent lower than AshBritt in all three regions, while ECC offered lower prices than AshBritt in Regions 5 and 6A.  For CLIN [   ], Ceres and Phillips & Jordan again offered lower prices than AshBritt in all three regions, while ECC offered lower prices in Regions 5 and 6A.  For CLIN [   ], Ceres' prices in all three regions were approximately [   ] percent lower than AshBritt's, while ECC's prices in Regions 5 and 6A were lower than AshBritt's, and Phillips & Jordan offered lower prices in Regions 6A and 6B.  In Region 5, for CLIN [   ], Ceres and Crowder Gulf offered lower prices than AshBritt.  For CLINs [   ] and [   ], Ceres and Phillips & Jordan offered lower prices in all three regions than AshBritt, while ECC offered lower prices than AshBritt in Regions 5 and 6A and Crowder Gulf underbid AshBritt in Region 5.

regarding these same nine CLINs -- even where their prices were lower than AshBritt's.[31]  Instead, the agency informed ECC and Ceres only that their prices on "many" CLINs were low in comparison with the IGE.  AR at 466, 469.[32]  Thus, the agency told AshBritt its higher prices were low compared to the IGE on a CLIN-by-CLIN basis, while not mentioning to other offerors that their lower prices for these same CLINs were low on a CLIN-by-CLIN basis.  Defendant and Intervenors have advanced no rationale for this type of differing treatment, and the Court can discern none.[33]

Defendant argues that there is "no substantive difference" between informing an offeror that "many" CLINs are low and informing an offeror that specific CLINs are low.  Tr. (Jan. 16, 2009) at 85.  The Court disagrees.  An offeror that is informed only that "many" of its prices are low is left to its own judgment as to which prices out of the [ ] CLINs it should raise.  On the other hand, an offeror that is informed that its prices on nine specific CLINs are low is on notice to reconsider these particular prices, and a reasonable response is to raise these prices.  In Sytronics, Inc., No. B-297346, 2006 Comp. Gen. Proc. Dec. ¶ 15, 8-9 (Dec. 29, 2005), GAO held that discussions were unequal where, during price discussions, the agency informed one offeror that its price "appeared high" while telling another offeror that its price "appeared excessive."  Though the Contracting Officer maintained that the use of different terms was not intended to favor one proposal over another, GAO agreed with the protestor "that a vendor would reasonably view the term 'excessive' as sending a stronger message than the term 'high,'" noting that this distinction was consistent with the larger price reduction made by the offeror whose price had been described as excessive.  Id.

---

[31]  The agency did not break out its discussions of prices on a region-by-region basis with any offerors -- it discussed pricing across the board for all regions, even though prices could have differed and in some instances did differ among regions.

[32]  In Regions 5 and 6A ECC's prices on CLINs [     ], [     ], and [     ], before discussions, were markedly lower -- all roughly [          ] of AshBritt's prices.  Though the agency singled out AshBritt's prices on these three CLINs -- significant CLINs in terms of pricing -- as being low, the agency gave no such indication to ECC.  Following discussions, AshBritt raised its prices on these CLINs, while ECC [                              ].  ECC ultimately won the primary contracts for both Regions 5 and 6A.  In all three regions, Ceres' prices were lower than AshBritt's for all nine CLINs -- between [ ] percent and [ ] percent lower on CLINs [     ], [     ], and [     ] -- yet the agency advised only AshBritt that its prices on these specific CLINs were low, while the agency advised Ceres in more general terms that its prices on "many" CLINs were low.  Ceres ultimately won the primary contract for Region 6B.  Similarly, Phillips & Jordan's prices on CLINs [     ], [     ], [     ] and [     ] were lower than AshBritt's prices in all three regions.  Yet the agency gave no indication that any of Phillips & Jordan's prices were low.

[33]  The agency's discussions with Phillips & Jordan were unequal as well.  While AshBritt was informed that its prices on nine specific CLINs were low, Phillips & Jordan's prices on four of those CLINs were even lower in all three regions, yet the agency said nothing at all.

Here, AshBritt reasonably interpreted the discussions it received on nine CLINs as sending a message that it should raise those specific prices while Ceres and ECC did not raise all nine CLIN prices -- having received the more generalized message that "many" prices were low.  That AshBritt raised its prices on all nine CLINs -- while ECC either maintained or lowered its prices on them -- is consistent with the stronger message that the agency's targeted advice conveyed to AshBritt.[34]

The agency also engaged in unequal discussions regarding prices it deemed to be high.  The agency informed Plaintiff and Intervenors that their prices on the following CLINs were high in comparison with the IGE:

| | | | |
|---|---|---|---|
| AshBritt: | [    ], [    ], [    ] | | |
| Ceres: | [    ], [    ], [    ], and [    ] | | |
| ECC: | [    ], [    ], [    ], [    ], and [    ] | | |

AR at 460, 466, 469.

Although Ceres was told its prices for CLINs **[    ]**, **[    ]**, and **[    ]** were high, AshBritt's prices for CLINs **[    ]** and **[    ]** were even higher, but AshBritt was told nothing.  Thus, the agency suggested to Ceres, but not Ashbritt, that it consider lowering its prices on these CLINs.

FAR § 15.306(e)(1) prohibits government personnel from engaging in conduct that "[f]avors one offeror over another."  However, the price discussions here did precisely this -- telling some offerors their prices for discrete CLINs were low but not others, and telling some offerors, but not others, that their prices were high.

As this Court has recognized, an agency need not discuss every aspect of a proposal which may be improved and has no responsibility to inform an offeror that its price is high where that price is not considered excessive or unreasonable.  Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 385 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004).  Nonetheless, once undertaken, discussions must be equal and must not mislead offerors.  The Government may not inform some offerors of a concern with their pricing level while staying silent with respect to identical issues in other offerors' proposals.  See Multimax, Inc., No. B-298249.6, 2006 Comp. Gen. Proc. Dec. ¶ 165, 14-15 (Oct. 24, 2006) (finding price discussions unequal where the agency advised some offerors that prices where high in comparison with the IGE while not advising others whose prices were even higher).

Defendant argues that AshBritt was free to disregard the agency's advice and that any changes in price resulted from AshBritt's own business judgment.  Defendant notes that AshBritt

---

[34]  Though Ceres also raised its prices for eight of these CLINs, its prices for three CLINs in Region 5 were not changed.  In contrast, ECC **[**

**]**.  ECC won the primary contracts in both Regions 5 and 6A.

lowered some prices without any input from the agency that its prices were high, and lowered its price further on CLIN **[     ]** despite the agency's advice that AshBritt's original price for this CLIN was low. This argument ignores the mandate of FAR § 15.306(e)(1), which imposes an obligation on the Government to treat offerors equally. The agency violated this obligation here, and its supposition that AshBritt could have ignored the agency's advice does not erase this error.

### The Agency's Price Discussions Were Misleading Because It Changed The IGE Against Which Price Proposals Had Been Measured Without Advising Offerors

AshBritt next argues that the agency conducted inadequate and misleading discussions by relying on a flawed IGE during its discussions with offerors, then later revising that IGE at the evaluation stage without notice to the offerors.[35] Specifically, Plaintiff contends that it was improper for the agency to revise the IGE without reopening discussions and advising offerors whether their bids were high or low as compared to the revised IGE.

Seven months after the August 31, 2007 discussions, the agency revised the IGE -- lowering the IGE for CLIN **[     ]** from $**[        ]** to $**[        ]** -- but did not conduct additional price discussions following this revision.[36]

AshBritt's initial bid for CLIN **[     ]** was $**[     ]** -- below the initial IGE of $**[     ]**. After the agency had informed AshBritt that its bid on CLIN **[     ]** was low in comparison with the IGE, AshBritt raised its price to $**[     ]**. However, the agency later revised the IGE for CLIN **[     ]** to $**[     ]** without telling AshBritt -- whose price then exceeded the IGE. Without additional discussions, AshBritt could not know when it submitted its final offer that the agency's advice during the original discussions was no longer accurate with respect to the agency's revised IGE -- making AshBritt's pricing revisions based upon those earlier discussions the product of erroneous guidance. After the IGE was revised to $**[     ]**, AshBritt's price of $**[     ]** was more than **[     ]** as high, but AshBritt was never told this. As such, the agency's earlier discussions were rendered misleading. Cf., Biospherics, Inc., No. B-278278, 98-1 Comp. Gen. Proc. Dec. ¶ 161, 6-8 (Jan. 14, 1998) (finding misleading discussions where the agency had advised the protestor that its prices were high but failed to inform the protestor that additional cost analysis performed after discussions determined that the protestor's prices were instead "unrealistically low").

---

[35] AshBritt contends that the original IGE was flawed based upon the two DCAA audit reports which pointed out potential problems with ADMS pricing, the pricing for the mock hurricane and the range of pricing for CLINs **[     ]** and **[     ]** as compared with the IGE. However, AshBritt has not demonstrated that the IGE was flawed. The DCAA pointed out potential problem areas with ADMS pricing which the agency cured, and other potential problems identified by the DCAA did not rise to the level of flaws. Rather, the DCAA blessed the model price analyses and concluded that there was sufficient pricing data for selection.

[36] The agency also lowered the IGE for CLIN **[     ]**, but AshBritt's price for this CLIN was lower than both the original IGE and the revised IGE.

**The Agency's Discussions Regarding The ADMS System Were Adequate**

AshBritt next complains that the agency conducted inadequate discussions regarding the pricing of the ADMS system. AshBritt alleges that the SSEB acknowledged in its Initial Evaluation Report of August 20, 2007, that discussions were needed to improve understanding of the ADMS requirements, provide feedback to the offerors on their strengths and weaknesses, and increase the overall value of the offers. AR at 390. Because the SSEB's revised Initial Evaluation Report of March 21, 2008, prepared after discussions had been conducted, repeated this language, AshBritt argues that the needed discussions on ADMS pricing never took place. See also AR at 716-17.

Defendant has established that the ADMS discussions did in fact take place on August 31, 2007, and that it advised offerors that CLIN [    ] would be subdivided into five sub-CLINs in order to "provide the offerors with further guidance and information on how to estimate the cost for ADMS." AR at 45. Defendant points to the written summary of its discussions with AshBritt, which indicates that "Ashbritt likes the revised language for pricing ADMS" and "[a]grees it should lead to more competitive pricing." AR at 480. Finally, the Contracting Officer explained in his amended declaration that the recurring language in the revised SSEB report regarding needed discussions on ADMS was simply a mistaken carryover from the original report. Amended [    ] Decl. (May 6, 2009) at ¶¶ 6-8. As such, the Court denies this ground of protest.

**The Agency Departed From The Terms Of The Solicitation By Excluding Price In Selecting Reach Back Assignments**

AshBritt next argues that the agency departed from the express terms of the solicitation in failing to consider price in evaluating reach back assignments.

In its revised source selection decision, the agency stated, "[i]t is the intent of the Government to select a contractor for a reach back assignment based on receiving the highest non-cost ratings in that region. The Government never intended to complete a trade off analysis for a reach back assignment." AR at 623. However, Section M.2 of the solicitation addressed reach back assignments as follows:

> For major disasters, Regional ACI contractors from outside the impacted region shall provide reach back capability. The reach back contractor may be utilized if one or more of the following criteria exist: (1) A single event . . . has generated in excess of 10M CY of debris (2) The Regional [primary] contractor has had two or more rating periods with a score of 50 or less on any task order (3) The Government is unable to negotiate fair and reasonable prices for the task orders.
>
> Offerors shall indicate . . . their willingness to participate in the reach back program and, if so, the regions that they wish to participate. The assignment of reach back responsibilities will occur during the

> selection process.  Selection of reach back firms for every region <u>will be based on how an offeror's proposal fared in the evaluation for that region and if the offeror expressed interest in the program</u>.  The determining factor is that the offeror will have to receive an award in another region.  Further, the offeror will have to win in a non-adjacent region.  Reach back for any region shall not be chosen, if it is not in the Government's best interest.

AR at 317 (emphasis added).  Nothing in the solicitation excluded price from the reach back selection process.  Likewise, the Source Selection Plan nowhere stated that price would be excluded from the reach back selection process.  AR at 745-82.  The Source Selection Plan provided:

> Offerors are also asked to submit regions that they want to be considered for a reach back assignment with the understanding that only contractors receiving [primary] awards for a geographic region will be assigned to a reach back region.  Further, reach back will be for a non-adjacent region.  For example, Region 3's 2nd ranked offeror wins Region 1.  The SSA would assign the Region 1 contractor as Region 3's back up.

AR at 745.  This was the extent of the Source Selection Plan's guidance on evaluation of reach back assignments.  The plan, like the solicitation, indicated that the totality of evaluation criteria, including price, would be in play for both reach back assignments and primary contract awards.  The above-quoted excerpt from the Source Selection Plan expressly indicated, by way of example, that the "second-ranked" offeror in a given region would win the reach back assignment for that region so long as it had won the primary contract for a different region.  Price was to be used in determining the second-ranked offeror in each region.  The selection of the second-ranked offeror in each region was to be made as part of a best value tradeoff for the primary contract and could not have ignored price.  Rather, the solicitation prescribed that reach back assignments would be selected based on the same criteria as primary contracts -- past performance, management/operations plan, small business subcontracting plan, technical approach to sample task order, <u>and</u> price.  AR at 317-19.

The Government's effort to backpeddle from this evaluation scheme in its Source Selection Decision and ignore price in selecting reach back awardees is arbitrary, capricious and unreasonable.  It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation.  FAR § 15.305(a) provides that, "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."  <u>See also</u> <u>Hunt Bldg. Co. v. United States</u>, 61 Fed. Cl. 243, 273 (2004) ("The agency's failure to follow its own selection process embodied in the Solicitation is . . . a prejudicial violation of a procurement procedure established for the benefit of offerors."); <u>Banknote</u>, 56 Fed. Cl. at 386 ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."); <u>ITT Fed. Servs. Corp. v. United States</u>, 45 Fed. Cl. 174, 194 (1999) (citations omitted) ("[A] contract award may not be upheld when the [source selection authority] improperly departs from [the] stated evaluation criteria in a solicitation.").

Moreover, Defendant's interpretation of the solicitation to exclude price from the reach back evaluation would pose a fundamental issue regarding what rates the reach back assignees would be paid. Defendant asserts that the reach back contractor for a given region would be paid at the prices it bid in another region -- the region for which it received a primary contract. According to Defendant:

> [I]t's significant to note that the pricing of that reach back work comes out of the contract that that contractor has. That is, the reach back was an additional performance obligation within the contract that that contractor had received. It wasn't, as indicated in the solicitation, a separate contract. There were 10 contracts and nine additional performance awards for reach back responsibility.

Tr. (Jan. 16, 2009) at 63-64. Assuming the reach back contractor is paid out of the contract it has received in another region, Defendant maintains that there would be no reason to require price as a consideration in the reach back assignment. Thus, the Government submits that reach back assignees would not be paid the rates they bid in the reach back region, but rather the rates they bid in the other primary region they won. For example, the Government's position is that even though an offeror priced a given region separately and differently -- say Regions 1 and 3 -- the reach back assignee for Region 3 would be paid the prices it bid in Region 1 where it won the primary contract, even though it would be doing the work in Region 3.[37]

Depending on what the rates bid were versus the rates actually incurred in a given locale, Defendant's interpretation of the pricing scheme could result in a contractor either receiving a windfall or losing its shirt. Defendant's suggestion during oral argument that the problem of paying a reach back assignee based upon the prices it bid in another region might be resolved by "some flexibility in repricing the CLINs on the task orders if it's for a different region" ignores the solicitation's provision that the rates an offeror proposed on its Schedule B were "binding rates." Tr. (Jan. 16, 2009) at 66-67; AR at 212. The agency's reading of the solicitation to exclude price from evaluation of reach back assignments also conflicts with both AshBritt's and Ceres' reading.[38] AshBritt stated that its understanding was "that there [would] be prices submitted for the primary contract in a region, and those will be used for that region's reach back." Tr. (Jan. 16, 2009) at 169-

---

[37] Section M.5, discussing the evaluation factors, provided that "[a] separate price evaluation will be completed for each region" and required offerors to submit prices "for every region for which they wish to be considered." AR at 319. In line with this pricing scheme, offerors could and did submit different prices in different regions. For example, AshBritt bid $[          ] in Region 1; $[          ] in Regions 2A, 2B, 2C, 3, and 4; $[          ] in Region 5; and $[          ] in Regions 6A and 6B. AR at 595-96. Ceres submitted different bids for the Alaska and Puerto Rico regions than it did for all other regions, while ECC submitted a different bid in each region for which it competed.

[38] These are the only offerors whose interpretation is on the record.

42

70 (emphasis added).  In other words, the reach back awardee for a region would be paid based on the prices it bid for the primary award in that same region.  Ceres concurred with AshBritt on this interpretation, stating:

> [I]f you look at the solicitation you could not receive a reach back assignment unless you express interest in a <u>primary award for that region</u>, which means that you proposed prices for <u>that</u> region.  It's my belief that those prices would be the prices that would be used if you were given an assignment under your reach back.  That takes out the notion of Hawaii prices in New York or whatever.

Tr. (Jan. 16, 2009) at 147-48 (emphasis added).

Because the agency departed from the solicitation's express terms in evaluating reach back assignments without considering price, its evaluation was arbitrary and capricious.

## The Agency Did Not Violate The Solicitation By Failing To Require Offerors To Fully Burden Prices

Finally, AshBritt argues that the agency failed to enforce the solicitation's requirement that prices be fully burdened.  Specifically, AshBritt argues that the agency did not evaluate price in the manner required by the solicitation by accepting unburdened prices.[39]  The Court rejects this ground of protest.

Section B.1 of the solicitation provides that "rates shall be fully burdened with indirect cost and profit."  AR at 212.  AshBritt alleges that although several offerors did not fully burden their prices for CLIN [     ], the agency erroneously failed to disqualify such bids as nonresponsive.

With regard to firm-fixed-price contracts, the FAR states:

> A firm-fixed-price contract provides for a price that is not subject to
> any adjustment on the basis of the contractor's cost experience in

---

[39]  On this ground, AshBritt originally sought summary judgment because, in addition to the AR, it relied upon the declaration of [               ], a consultant and contract administrator for AshBritt.  AshBritt's Br. at 1, n. 1.  During a telephonic conference on May 1, 2009, the Court orally ruled that a motion for summary judgment was not the appropriate procedural vehicle in light of Rule 52.1 which governs actions involving review of an administrative record.  Rather, Plaintiff should have sought leave to supplement the AR.  After a colloquy, Plaintiff withdrew the [        ] declaration, and Defendant, which had similarly appended a declaration of the Contracting Officer to its cross-motion for judgment on the AR, withdrew that declaration, the declaration of [
   ] dated October 20, 2008.  On May 6, 2009, Defendant filed a motion to supplement the AR with an amended declaration of Contracting Officer [     ].

performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties.

FAR § 16.202-1.

Against this legal framework, the Court does not read the solicitation's provision on fully burdened prices as requiring rejection of unburdened pricing. Rather, the solicitation here simply reiterated a basic principle of firm-fixed-price contracting: "[t]he rates shall be fully burdened with indirect cost and profit. All rates shall be binding and must be honored during the base period of this contract on any resulting task orders." AR at 212. This provision instructed offerors that whatever pricing they submitted was final and deemed to include burden. As such, a contractor could not recover add-ons to its fixed-price bid by attempting to burden its prices after the fact. Fixed-price contracting, as a general matter, lays the risk for underbidding at the foot of the offeror. As the Federal Circuit iterated this principle, "[t]he risk of loss for misjudging what it takes to perform, or for deliberately underbidding, is on the contractor, not the Government." Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1384 (Fed. Cir. 1999).

## The Agency's Errors Prejudiced AshBritt

Defendant and Intervenors argue that even if the agency conducted this procurement improperly, AshBritt was not prejudiced because the net impact of the agency's discussions resulted in an overall reduction in AshBritt's price. Defendant and Intervenors note that in Regions 5, 6A, and 6B, AshBritt was the high bidder by a significant margin. Specifically in Region 5, AshBritt's price was $[          ] above ECC's winning bid of $[          ], in Region 6A, AshBritt's price was $[          ] above ECC's winning bid of $[          ], and in Region 6B, AshBritt's price was $[          ] above Ceres' winning bid of $[          ]. Defendant and Intervenors posit that AshBritt could not have been awarded additional contracts even if the alleged unequal discussions and unequal evaluation of the small business subcontracting plan had not occurred.

Defendant and Intervenor view the prejudice determination too myopically in the context of this procurement. This was not an advertised low-bid-wins procurement, where price was determinative. Rather, this was a complex best value procurement for the acquisition of critical emergency services across several different geographic regions of this country in the event of a catastrophe. All of the technical factors and subfactors when combined were significantly more important than price. The evaluators were to consider the technical qualities on a proposal-by-proposal basis and on a region-by-region basis. This competition anticipated 10 prime contracts and up to 10 reach back assignments with a host of technical, small business and regional considerations. As the Federal Circuit recognized in Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1368 (Fed. Cir. 1999), "while price differential may be taken into account, it is not solely dispositive; we must consider all the surrounding circumstances in determining whether there was a substantial

chance" of award to the protestor.

Here, the procurement errors were not confined to the pricing side of the fence. The agency failed to conduct equal discussions and favored ECC and Phillips & Jordan by telling them they had failed to address HBCU/MI participation in their subcontracting plans. These offerors were upgraded for additions to their proposals responding to these discussions, while AshBritt was downgraded for this identical omission. This unfairness was exacerbated by the solicitation's assignment of "zero" to this HBCU/MI goal and Appendix DD's instruction that this zero goal was to be evaluated and scored. In the face of this conflict, the error in discussions took on enhanced gravitas. Another technical evaluation error further contributed to the lack of a level playing field here. The agency failed to document whether AshBritt's revisions to the past performance content of its subcontracting plan were even considered -- given AshBritt's enhanced proposal and the unexplained and undocumented repeat score of zero.

With regard to pricing, the errors in discussions were so pervasive that it is impossible to predict what offerors would have bid on each CLIN had there been equal guidance as to which prices were low in comparison with the IGE and which were high.

So too, in excluding price evaluation from the reach back selection, the agency failed to follow the terms of the solicitation -- a failure that illuminated a significant and fundamental misunderstanding not only about how reach back selections were to be evaluated, but how reach back assignees, if activated, were to be paid. Indeed, two offerors reasonably interpreted the solicitation as requiring reach back contractors to be paid the prices they bid for the reach back regions awarded, while the Government posits that reach back contractors were to be paid based upon pricing in some other primary region(s) they were awarded. This fundamental flaw infected both the ability of offerors to submit offers on a level playing field and their ability to be evaluated in accordance with the solicitation and on consistent terms with other offerors. It is impossible to predict how correcting this error will impact any re-evaluation.

The agency also failed to afford offerors an opportunity to revise proposals in the wake of a revised IGE which rendered prior discussions misleading and proposal revisions for CLIN 0029 obsolete and erroneous.

Defendant and Intervenors assume that, even after reopened discussions on both price and the subcontracting plan, the offerors' pricing and technical evaluations would remain the same, or that the pricing would remain so far apart that AshBritt would not have a substantial chance of award. Yet, this ignores the reality that offerors typically revise proposals in response to discussions -- a circumstance carried out in this procurement and which the Government welcomed to attain the best value. See AR at 600. Even if all proposals at the end of the day are rated "Outstanding" on all non-cost factors, this rating does not mean that they would be technically equal. Rather, as the Army's Source Selection Manual, incorporated into the solicitation, provided, "[t]o determine which proposal provides the best value, the [source selection authority] must analyze the differences between competing proposals. . . . [and] consider each proposal's total evaluated price and the discriminators in the non-cost ratings as indicated by each proposal's strengths, weaknesses, and

risks." AFARS Appendix AA at 39, 41.  Thus, the agency must do a head-to-head comparison of revised proposals submitted after corrective action of discussions, and cannot now predict what the discussions will entail, what the revised proposals will offer, or what the head to head contest will yield in terms of best value.

To establish prejudice, the protestor must demonstrate that there was a "substantial chance" it would have received the award but for the errors in the procurement process.  Bannum, 404 F.3d at 1353.[40]  As the Court recognized in Serco Inc., v. United States, 81 Fed. Cl. 463, 501 (2008), the nature of a prejudice analysis is necessarily different in contexts beyond the ordinary bid protest where circumstances such as multiple awardees or manifold or systemic errors must be considered together in assessing prejudice.  As Judge Allegra aptly put it in Serco:

> With all of these varied dimensions, and since it beyond peradventure here that the slightest shifting of a single adjectival rating could have significant impact not only on the ranking of a given protester, but also on who they might be compared with in a tradeoff analysis, the court is left with the firm conviction that the combined impact of the errors encountered here clearly prejudiced . . .  the [protestor].

---

[40] AshBritt urges this Court to apply the alternative prejudice standard recently articulated by the Court of Federal Claims in Allied Materials & Equipment Company v. United States, 81 Fed. Cl. 448 (2008).  In Allied Materials, the protestor lodged a "post-award, solicitation-based protest based on a defect in the solicitation of which the plaintiff was unaware until after the closing date for offers."  Id. at 456.  As such, the "substantial chance" test was not suitable for assessing prejudice.  Id.  Nor was the prejudice test applied in pre-award solicitation-based protests -- that the agency's error must have created "a non-trivial competitive injury capable of being redressed by judicial relief."  Id. at 456-57 (citing Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 35 (2007)).  Chief Judge Hewitt therefore articulated a new test.  Specifically, in cases where the protestor challenges a solicitation defect which came to light only after the evaluation was completed, "the court will find prejudice if plaintiff demonstrates that, absent the error, it would have had a chance of receiving the contract award that is more than merely speculative."  Id. at 457.

It is appropriate to apply this lighter prejudice test to AshBritt's allegation that the agency departed from the terms of the solicitation by not evaluating price in the selection of reach-back assignees.  The agency's interpretation of its solicitation to exclude price evaluation from the selection of reach back assignees only came to light in the source selection decision and was contrary to the solicitation.  The agency's flawed interpretation of the solicitation could not have been discerned prior to the submission of proposals or, for that matter, prior to the agency's explanation of its evaluation in the source selection decision.  Although this allegation would fit within the Allied Materials "more-than-merely speculative chance of award," test, this Court is convinced that AshBritt has demonstrated prejudice under either this standard or the traditional "substantial chance" standard.

Id.

The nature of this procurement and sum total of these procurement errors do not lend themselves to a prejudice assessment based only upon assumed pricing corrections woodenly applied -- using faulty bids resulting from faulty discussions -- to predict what offerors might propose after proper discussions, or which offerors might succeed in a reprocurement -- or even to engage in the more modest speculation that AshBritt would be a sure bet loser. Indeed, AshBritt was a successful offeror in this very procurement in a region not at issue here. As in Serco, this Court is left with the firm conviction that the protestor has been prejudiced by the manifold procurement errors. Absent these errors, AshBritt would have had a substantial chance of awards and reach back assignments in the regions at issue.

## AshBritt Is Entitled To Injunctive Relief

To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest. See Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000), aff'd, 10 F. App'x 957 (Fed. Cir. 2001); cf. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391-93 (2006) (rejecting a "general rule" favoring or disfavoring injunctive relief, and applying a four-part test employed by courts of equity). No one factor is dispositive, and "the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).

Because AshBritt has succeeded on the merits of its case, this factor weighs in AshBritt's favor. AshBritt would be denied the opportunity to recoup profits and to benefit from a lawful procurement process were injunctive relief denied. Such loss of profit stemming from a lost opportunity to compete on a level playing field has been found sufficient to constitute irreparable harm. United Payors & United Providers Health Servs. v. United States, 55 Fed. Cl. 323, 333 (2002); MVM, Inc., v. United States, 46 Fed. Cl. 137, 142-43 (1999).

In considering whether the balance of the hardships tips in favor of a protestor in a post-award bid protest, a court must balance the potential harm to the protestor of not granting the injunction against the potential harm to both the Government and the awardees should the injunction be granted. ES-KO, Inc. v. United States, 44 Fed. Cl. 429, 435 (1999). Generally the public interest is served by ensuring fair and open competition in the procurement process. Cincom Sys. v. United States, 37 Fed. Cl. 266, 269 (1997) (citing Magellan Corp. v. United States, 27 Fed. Cl. 446, 448 (1993)). Defendant argues that the public may suffer irreparable harm if the current awards are disturbed because there would be no debris removal contracts in place for months and the agency could not respond promptly to any catastrophic events which might occur during that timeframe. This argument misapprehends the nature of the injunctive relief sought. AshBritt does not seek either temporary or preliminary injunctive relief and has acknowledged that the current contracts must remain in place pending the outcome of any new evaluation and selection decisions -- ensuring a smooth transition from the current contracts to any new awards and minimizing interference with this country's emergency preparedness efforts. See Tr. (May 13, 2009) at 9-11. Given that there will

be no interference with, or disruption of, the current contracts or reach back assignments while the agency takes corrective action in accordance with the injunction order, the harm to the Government and awardees stemming from this limited injunction is far less than the harm would be to AshBritt in permitting these pervasive and fundamental procurement errors to go unredressed.

Finally, the Court finds that an injunction will serve the public interest, noting that "[i]t is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004) (citing United Int'l Investigative Servs. v. United States, 41 Fed. Cl. 312, 323 (1998), aff'd, 163 F. App'x 853 (Fed. Cir. 2005)).

In fashioning limited injunctive relief here, the Court is mindful of the Federal Circuit's recent guidance in Axiom that "[t]he Supreme Court has warned against undue judicial interference with the lawful discretion given to agencies." Axiom, 564 F.3d at 1384 (citing Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 67 (2004) ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.").  The instant procurement involved a complex effort to secure emergency preparedness services in advance of a catastrophe warranting their implementation. While in this Court's view manifold errors infected the conduct of this procurement, it is not for this Court to dictate the particulars of each step the agency should take to remedy what transpired. Rather, the agency is directed to procure its services in accordance with statute and regulation and to exercise its discretion reasonably.

## AshBritt Is Not Entitled To Recover Bid And Proposal Preparation Costs

Under the Tucker Act, this Court "may award any relief that the court considers proper," including declaratory and injunctive relief and bid and proposal preparation costs.  28 U.S.C. § 1491(b)(2).  This provision of the Tucker Act, "through use of the permissive 'may,' provides the Court of Federal Claims with discretion in fashioning relief." PGBA, L.L.C. v. United States, 389 F.3d 1219, 1226 (Fed. Cir. 2004).  Because the Court grants AshBritt's request for injunctive relief, and AshBritt will have the opportunity to re-compete for additional awards, the Court declines to award bid and proposal preparation costs.  While the Tucker Act does not preclude monetary damages if injunctive relief has been granted, the Court takes into account "the facts and circumstances of the particular case" in exercising its discretion whether to award both injunctive relief and bid and proposal preparation costs.  See CNA Corp. v. United States, 83 Fed. Cl. 1, 11 (2008).

Bid and proposal preparation costs are a form of reliance damages which are properly awarded when the costs have been wasted.  See, e.g., Centech Group, Inc. v. United States, 79 Fed. Cl. 562, 564 (2007) (finding that the protestor may be entitled to bid and proposal preparation costs "if it can demonstrate that such costs were wasted.").  Here, AshBritt has achieved the goal of its protest -- to secure, through injunctive relief, the chance to compete for further awards under this procurement on a level playing field.  If AshBritt succeeds in winning additional awards, its bid and

proposal preparation costs will not have been "wasted" in this procurement.  Furthermore, AshBritt has already received both a primary award and a reach back assignment under this procurement which were not displaced by the Court's injunction here, demonstrating that its bid and proposal preparation costs were not wasted.  As such, the Court declines to award the additional relief of bid and proposal preparation costs.

### Order

1.      AshBritt's Motion for Judgment on the Administrative Record is **GRANTED in part**.

2.      The Court **GRANTS** Plaintiff's request for a declaratory judgment and Motion for a Permanent Injunction as follows:

   a.   The Court hereby declares the Army Corps of Engineers' selections of primary contract awardees in Regions 5, 6A and 6B, and reach back assignments in Regions 2C, 4, 5, 6A and 6B under Solicitation No. W912P8-07-R-0101 to have been arbitrary, capricious and in violation of the FAR and the terms of the solicitation.  Nonetheless, because of the urgency of the services, these awards are not set aside.  Said awards and assignments shall be set aside once the agency has taken corrective action in accordance with this order and has completed any new selection decisions;

   b.   The Army Corps of Engineers, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement, be and they are hereby ordered to reprocure the services awarded in the primary contracts in Regions 5, 6A and 6B and the reach-back assignments in Regions 2C, 4, 5, 6A and 6B in accordance with statute, regulation and a reasonable exercise of discretion.  Such reprocurement shall be completed within 12 weeks of the date of this decision, absent good cause.  In the interim, the contracts and reach back assignments that are the subject of this protest shall remain in full force and effect.

3.      The Court **DENIES** Plaintiff's request for bid and proposal preparation costs.

4.      Defendant's and Intervenors' Cross-Motions for Judgment on the AR are **DENIED**.

5.      Plaintiff's Motion to Supplement the AR is **GRANTED**.

6.      Defendant's Motion to Supplement the AR is **GRANTED in part**.

7.      Prior to the release of this opinion to the public, the parties shall review this unredacted opinion for competition-sensitive, proprietary, confidential or other protected information.  The parties shall file proposed redacted versions of this

decision by **June 22, 2009**.

8.    The Clerk is directed to enter judgment on the AR in favor of Plaintiff consistent
with this opinion.

<u>s/Mary Ellen Coster Williams</u>
**MARY ELLEN COSTER WILLIAMS**
**Judge**